IN THE MATTER OF LAURA L.[1]

No. 00-P-746.

Plymouth. November 6, 2001. - May 28, 2002.

Present: BROWN, GREENBERG, & McHUGH, JJ.

*Practice, Civil,* Moot case, Commitment of mentally ill person. *Evidence,* Communication between patient and psychotherapist. *Waiver.*

This court declined to dismiss an appeal of a civil commitment order on the grounds of mootness, where the issues raised were of significant public interest, were likely to arise again, and had been fully briefed and argued by the parties. [856-857]

This court concluded that privileged statements made by an individual to a psychotherapist during a court-ordered examination in a proceeding under G. L. c. 123, § 12(*e*), for involuntary commitment to a mental health facility, may be disclosed at the ultimate commitment hearing only after the judge finds that the individual has made a knowing and voluntary waiver of that privilege pursuant to *Commonwealth* v. *Lamb,* 365 Mass. 265, 270 (1974); therefore, in the circumstances of such a proceeding, where the record raised the issue whether the individual in question was capable of making such a waiver, the judge's failure to make any inquiry into that issue, and his reliance on the privileged statements in issuing the order of commitment, created a substantial risk of a miscarriage of justice. [857-861]

APPLICATION for commitment filed in the Brockton Division of the Juvenile Court Department on August 11, 1998.

The case was heard by *John P. Corbett, J.*

*Deborah W. Kirchwey* for Laura L.

*Beverly Coles-Roby,* Assistant Attorney General, for Department of Social Services.

GREENBERG, J. Laura protests that a Juvenile Court judge's order, committing her involuntarily to a mental health facility pursuant to G. L. c. 123, § 12(*e*),[2] was invalid because state-

---

[1]A pseudonym.

[2]As in effect prior to St. 2000, c. 249, §§ 4-8, G. L. c. 123, § 12(*e*), stated, in pertinent part:

ments that she made to a court-appointed psychologist were admitted in evidence without a knowing *Lamb* waiver. See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974).[3] We conclude that the judge's failure to make any inquiry or findings on the *Lamb* issue was error, amounting to a substantial risk of a miscarriage of justice and, therefore, vacate the order of commitment.

This, in outline, is the tortured history of the dispute. After our decision in *Care & Protection of Bruce*, 44 Mass. App. Ct. 758 (1998), in which we considered the problematic mental state of Bruce's mother, Laura, but ultimately held that the finding of parental unfitness was not supported by clear and convincing evidence, that a remand was required to determine if custody could be returned to Laura with appropriate monitoring by the Department of Social Services (DSS), and that DSS could proceed with its petition to dispense with Laura's consent to the adoption of Bruce. A different juvenile court judge complied with our remand order and undertook an inquiry into whether Bruce could safely be returned to Laura's custody. The judge conducted this inquiry on four separate days in 1998. On

---

"Any person may make application to a . . . justice of the juvenile court for a ten day commitment to a facility of a mentally ill person whom the failure to confine would cause a likelihood of serious harm. After hearing such evidence as he may consider sufficient, . . . a justice of the juvenile court may issue a warrant for the apprehension and appearance before him of the alleged mentally ill person, if in his judgment the condition or conduct of such person makes such action necessary or proper. Following apprehension, the court shall have the person examined by a qualified psychologist in accordance with the regulations for the department [of mental health]. If said . . . qualified psychologist reports that the failure to hospitalize the person would create a likelihood of serious harm by reason of mental illness, the court may order the person committed to a facility for a period not to exceed ten days, but the superintendent may discharge [her] at any time within the ten day period."

[3]In *Commonwealth* v. *Lamb*, *supra*, the Supreme Judicial Court construed G. L. c. 233, § 20B, "as preserving a patient's rights to keep privileged any communications made to a court-appointed psychotherapist in the case of a court-ordered examination, absent a showing that he was informed that the communication would not be privileged and thus, inferentially, that it would be used at the commitment hearing."

the last day, August 11, 1998, Laura was seen pacing back and forth outside the courthouse, allegedly saying that she would like to "put everybody [DSS workers, Bruce's foster mother, and the judge] in a room and blow it up." The witnesses who heard these alleged comments told court officers, and after hearing testimony from those witnesses, the judge prompted the DSS attorney to apply for a warrant of apprehension.[4] All of this occurred prior to any decision whether Bruce would be at risk if returned to Laura's custody.

The next day, Laura was arrested and brought into court for an examination by Dr. Gary Dube, a "qualified psychologist," pursuant to G. L. c. 123, § 12(e). Another attorney, unfamiliar with the ongoing custody inquiry and not certified by the Committee for Public Counsel Services to handle mental health matters, was appointed to represent Laura at the commitment hearing.

Prior to interviewing Laura at the courthouse, Dr. Dube gave her the required *Lamb* warning, which included notice of her privilege under G. L. c. 233, § 20B. See note 3, *supra*. In so doing, however, Dr. Dube noted in his written evaluation that "[t]he subject repeatedly interrupted the warning and for a period would not decide if she would consent to the interview. Ultimately, she consented with her attorney present, although *her understanding appeared somewhat impaired*" (emphasis added).

It is not necessary to detail the bizarre behavior manifested by Laura and observed by Dr. Dube during the remainder of his examination. Despite Dr. Dube's insecurity about Laura's consent to answering his questions, he also gleaned bits of information about many subjects relevant to her ability to parent as well as the history of her mental instability. His diagnosis, therefore, made an impact on the judge's commitment decision and the ultimate decision concerning her fitness as a parent.

Laura does not dispute that she cooperated with Dr. Dube during the examination at the courthouse. Her initial decision to speak with him, however, may have been stimulated by a belief

---

[4] While Laura was not present at this hearing, her attorney in the custody matters participated in the questioning of these witnesses along with the attorney for DSS.

that it would be "the best way that she could leave" and go home. According to Dr. Dube's subsequent testimony at the commitment hearing, however, "[I]t was difficult to complete the non-confidentiality warning in that [Laura] felt real pressured to speak. . . . [She] interrupted me frequently, and it took some time to complete the warning, and then some time further to get her to respond as to whether or not she wanted to participate. She ultimately did state that she wanted to participate and did respond to some of my questions." His written report stated that "her understanding [of the *Lamb* warning] appeared somewhat impaired." In his testimony, Dr. Dube described Laura's mental state, submitted his written evaluation, and concluded with his diagnosis that, without hospitalization and treatment, there was a "likelihood of serious harm" due to Laura's mental illness. G. L. c. 123, §§ 1, 12(*e*). See *Commonwealth* v. *Nassar*, 380 Mass. 908, 912-918 (1980) (applying statutory standard to commitment proceeding under G. L. c. 123, § 16[*b*]). This mental illness involved "hypomani[a,]" "delusion[s,]" and an "apparently persecutory ideation towards the foster mother and judge." At the conclusion of the hearing, the judge signed an order authorizing Laura's detention at a mental health facility in Brockton. She was detained there and discharged short of the ten days authorized under G. L. c. 123, § 12(*e*).

Laura's release on August 17, 1998, brings us to the threshold issue of mootness. DSS asserts that the issues raised by Laura, "even if capable of repetition, will not evade review," and notes that she could have sought relief by habeas corpus pursuant to G. L. c. 248, § 1, by a motion for relief from judgment under Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974), see *Temple* v. *Marlborough Div. of the Dist. Ct. Dept.*, 395 Mass. 117, 120, 127 (1985), or by filing for review in the Appellate Division of the District Court under G. L. c. 123, § 9(*a*) and (*b*). Laura recognizes the issue, but counters that "evad[ing] review" does not mean a case in which a party has no other avenue of redress. She, therefore, urges us to consider her appeal on the merits. In any event, the solution to this initial question is clear: the Supreme Judicial Court has repeatedly held that civil commitment and treatment-related cases are matters of significant public

interest that warrant an exception to the usual mootness rules. See *Acting Superintendent of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 103 (2000) (citing cases); *Cohen* v. *Bolduc*, 435 Mass. 608, 615 n.19 (2002). In addition, the instant case has been fully briefed and argued, and the important issues are likely to recur. See *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 783 (1984). For these reasons, we decline to dismiss Laura's appeal for mootness.

We come to the nub of the controversy. Laura attacks the admission of her statements that Dr. Dube incorporated into his testimony and written report, both of which were considered by the judge at the G. L. c. 123, § 12(*e*), hearing. Laura's position is that there was enough doubt — based on Dr. Dube's testimony — to alert the judge to the possibility that Laura was incapable of making a voluntary and knowing waiver after the *Lamb* warning.[5] Further, she argues that the judge failed to make any inquiry of her or Dr. Dube to determine whether she understood her right of confidentiality and made no findings on that important issue. Contrast *Commonwealth* v. *Barboza*, 387 Mass. 105, 108, cert. denied, 459 U.S. 1020 (1982); *Commonwealth* v. *DelVerde*, 401 Mass. 447, 451 n.8 (1988); *Adoption of Kirk*, 35 Mass. App. Ct. 533, 539 (1993).

In his testimony at the commitment hearing, and in his written evaluation submitted to the judge, Dr. Dube explicitly stated that he did, in fact, give Laura the *Lamb* warning. It is true, as Laura argues on appeal, that Dr. Dube did not warn her that the information requested in connection with the commitment proceeding might ultimately be used against her in the pending custody proceedings regarding her son. See G. L. c. 233, § 20B(*e*). More to the point here, the judge made no inquiry into her understanding and subsequent waiver of the statutory privilege. The record indicates that, at the point Dr. Dube recounted Laura's difficulties comprehending the warning, the

[5]Laura's trial attorney did not raise at trial the issue of the adequacy of her waiver. Nevertheless, the doctor's failure to obtain an adequate waiver created a substantial risk of a miscarriage of justice, so the issue should be addressed on appeal. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 524-525 (1986) (the failure to give *Lamb* warnings created a substantial risk of a miscarriage of justice warranting reversal and remand for new trial, although juvenile did not raise the issue below).

judge showed little interest and pressed Dr. Dube to relate Laura's responses to the questions put concerning her history and mental condition. It is this information that she now contests as extracted from her under duress and without a sufficient understanding of her rights.

Dr. Dube's testimony about Laura's difficulties should have served to alert the judge of the issue. To repeat, he testified that "[i]t was difficult to complete the nonconfidentiality warning in that [Laura] felt real pressured to speak." A moment later, there was testimony that Laura showed "concern[] that it was illegal [to be] there in the first place asking her questions . . . [and] that she would answer questions because she wanted to go home, and that she felt that was the best way that she could leave." We conclude, as stated at the beginning of this opinion, that the judge was remiss in not making a sua sponte inquiry at this juncture into whether Laura actually understood and knowingly waived her rights. By analogy, courts have excluded "statements by individuals suffering from mental illness if the disease rendered the individual incapable of understanding the meaning and effect of a confession or caused the individual to be indifferent to self-protection." *Commonwealth* v. *Vazquez*, 387 Mass. 96, 100 n.8 (1982).

In *Commonwealth* v. *Lamb*, 365 Mass. at 267-270, the court held that, in a "proceeding" under G. L. c. 123A for commitment of a sexually dangerous person, G. L. c. 233, § 20B, established a patient's right to keep privileged any "communications" made to a court-appointed "psychotherapist." See note 3, *supra*. In *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 526 (1986), the court extended this privilege to a juvenile seen by a psychologist and a psychiatrist[6] prior to proceedings under G. L. c. 120, §§ 16-20, to extend the term of his commitment to the Department of Youth Services. We see no reason why similar safeguards should not apply here.

In its brief, without much analysis, DSS takes the position that Dr. Dube's in-court disclosure of Laura's statements was

---

[6]The definition of "psychotherapist" in G. L. c. 233, § 20B, includes psychiatrists and psychologists.

justified by G. L. c. 233, § 20B(*a*).[7] We reject this contention. The argument is similar to one originally posed, explained, and not followed in *Commonwealth* v. *Lamb*, 365 Mass. at 267-268, where the Supreme Judicial Court resolved ambiguities in the language of that section and G. L. c. 233, § 20B(*b*),[8] as applied to sexually dangerous persons. In doing so, the court adverted to the possibility that the statutory privilege might not apply where disclosure was made "for the purpose of 'placing or retaining' [a patient in a hospital as well as] when it is made for the purpose of placing the patient under arrest or under the supervision of law enforcement authorities." *Commonwealth* v. *Lamb*, 365 Mass. at 268, quoting from G. L. c. 233, § 20B(*a*). However, a subsequent passage from *Lamb* puts to rest any doubts raised by DSS's argument, and places all court-ordered examinations under the ambit of G. L. c. 233, § 20B(*b*).[9]

Further, we think — as did the Supreme Judicial Court in

[7]Section 20B(*a*) of chapter 233 allows for disclosure of otherwise privileged "communications" by a "psychotherapist" in the following circumstances:

"If a psychotherapist, in the course of his diagnosis or treatment of the patient, determines that the patient is in need of treatment in a hospital for mental or emotional illness or that there is a threat of imminently dangerous activity by the patient against himself or another person, and on the basis of such determination discloses such communication either for the purpose of placing or retaining the patient in such hospital, provided however that the provisions of this section shall continue in effect after the patient is in said hospital, or placing the patient under arrest or under supervision of law enforcement authorities."

[8]Section 20B(*b*) of chapter 233 allows for disclosure of otherwise privileged "communications" by a "psychotherapist" in the following circumstances:

"If a judge finds that the patient, *after having been informed that the communications would not be privileged*, has made communications to a psychotherapist in the course of a psychiatric examination ordered by the court, provided that such communications shall be admissible only on issues involving the patient's mental or emotional condition but not as a confession or admission of guilt" (emphasis added).

[9]In *Lamb*, 365 Mass. at 268-269, the Supreme Judicial Court wrote:

"Perhaps more significantly, reading the statute as a whole, we are convinced that a construction which deems a court-ordered interview between a psychotherapist and a patient under G. L. c. 123A to be within the exclusive ambit of exception (*b*) yields a more effectual and

*Lamb* — that application of § 20B(*b*)'s notice requirement (essentially the *Lamb* warning as it has developed) affords a more harmonious reading of the statute in general, *id.* at 268-269, and "avoids considering whether the use of such statements in the absence of such warnings infringes upon the rights of due process guaranteed by the Fourteenth Amendment of the United States Constitution." *Id.* at 270. Attendant to the requirement of warnings, moreover, is that any waiver be knowing and voluntary. See note 7, *supra*; *Adoption of Carla*, 416 Mass. 510, 515 n.5 (1993) ("expressing doubt" whether mother waived privilege under G. L. c. 233, § 20B[*b*], after psychologist "presented her with an ultimatum"). When applied to a court-ordered examination pursuant to G. L. c. 123, § 12(*e*), subsequent to the issuance of a warrant of apprehension, a valid disclosure at the ultimate commitment hearing may come only after *Lamb* warnings are given and the judge finds a knowing and voluntary waiver of the privilege. In this way, we read G. L. c. 233, § 20B, harmoniously with the involuntary commitment proceedings specified in G. L. c. 123, § 12(*a*) and (*e*),[10] and avoid the constitutional difficulties posed when a person is examined and subsequently committed and deprived

---

harmonious piece of legislation. See *Mathewson* v. *Contributory Retirement Appeal Bd.*, 335 Mass. 610, 614-615 (1957). The policy of exception (*b*) is to permit a court to utilize expert psychiatric evidence by ordering an examination. In that situation, however, the statute recognizes that such court-initiated interviews entail certain risks for the person to be examined. It provides the procedural protection that notice is to be given if the privilege is not to apply in those circumstances. This protection seems particularly suitable for cases such as this where the patient runs the risk of commitment as a sexually dangerous person depending on what he says in an interview which in the normal course of affairs would be accorded confidentiality. If we were to hold that this protection was denied patients because psychiatric examinations under G. L. c. 123A also were covered by exception (*a*), we would render nugatory the important policy objective of the statute evinced by the notice requirement in exception (*b*). Such an interpretation is to be avoided. See *Selectmen of Topsfield* v. *State Racing Commn.* 324 Mass. 309, 312-314 (1949)."

[10]In resolving any ambiguity that may exist in the application of G. L. c. 233, § 20B, to Laura's situation, we construe that statute in combination with related statutes. Compare *In the Matter of the Liquidation of Amer. Mut. Liab. Ins. Co.*, 434 Mass. 272, 289 n.17 (2001).

of liberty without due process based on otherwise privileged statements.

To be sure, the record tells us, and the judge found, that the *Lamb* warnings were articulated to Laura by Dr. Dube. His observations of Laura were obviously admissible at the commitment hearing. *Sheridan, petitioner*, 412 Mass. 599, 605 (1992). See *Adoption of Abigail*, 23 Mass. App. Ct. 191, 198-199 (1986). Compare G. L. c. 233, § 20B (definition of "communications"); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 287 (1987). The relevant inquiry in this case, however, is not whether the warnings were given or whether Dr. Dube's observations are admissible; rather, the central question is the effectiveness of a *Lamb* warning given to an individual who might not understand it. The attention of the judge was concentrated not on this significant question, but on what Laura said to Dr. Dube concerning her mental state and the events that led to her apprehension. Indeed, the judge's comments at the close of the commitment hearing indicate that his principal concern was to obtain mental health treatment for her. However laudable that goal may have been, given Dr. Dube's preliminary assessment of what transpired during the interview, the judge should have taken the time to assess whether Laura's *Lamb* waiver was knowing and voluntary.

On this record, there was a substantial risk of a miscarriage of justice. The basis for the judge's order to commit was Dr. Dube's diagnosis, based on the privileged information gained in his examination. Given the significant nature of the rights involved, see *Vitek v. Jones*, 445 U.S. 480, 492 (1980) ("The loss of liberty produced by involuntary confinement is more than a loss of freedom from confinement"), and the societal stigma which attaches to an individual from commitment to a mental hospital, requiring the judge to make these findings is appropriate under a statute that already requires that notice be given.

In light of our conclusion, we need not consider Laura's other claims, that the evidence presented at the commitment

hearing was insufficient to support the judge's order and that her constitutional rights to due process, confrontation, and the effective assistance of counsel were violated.

*The order of commitment is vacated.*