ADOPTION OF TIA.[1]

No. 08-P-281.

Franklin-Hampshire. June 19, 2008. - November 10, 2008.

Present: McHugh, Brown, & Green, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Dispensing with parent's consent to adoption. *Practice, Civil*, Comment by judge.

At the trial of a petition to dispense with the mother's right to consent to her child's adoption, the judge should not have made comments, early in the trial, that were weighted assessments of evidence rather than issue-spotting alerts and thereby undercut the appearance of fairness in the proceeding; however, the judge's mistake did not warrant reversal, where the evidence substantially supported the judge's findings of fact and conclusions of law (which were based on the proposed findings of fact of the Department of Children and Families, but did not blindly follow them) that the mother was currently unfit to parent the child and that adoption was in the child's best interests. [121-124]

PETITION filed in the Franklin and Hampshire Counties Division of the Juvenile Court Department on March 22, 2005.

The case was heard by *Lillian Miranda*, J.

*Margaret M. Geary* for the mother.

*Madonna E. Cournoyer*, Assistant Attorney General, for Department of Children and Families.

*Deborah W. Kirchwey* for the child.

McHugh, J. The mother appeals from a decree of the Franklin and Hampshire Counties Division of the Juvenile Court Department terminating her parental rights to her daughter, Tia. On appeal, the mother argues that comments the judge made at the beginning of the trial, in conjunction with the judge's extensive use of the Department of Children and Families' (DCF) pro-

[1]A pseudonym.

posed findings of fact, prejudiced her and warrant a new trial.[2] Although the judge's comments are troublesome, our review of the entire record leads us to affirm the decree.

The evidence at trial showed that the mother, now thirty-three years of age, has been plagued by domestic violence and alcohol abuse for much of her life. She began drinking at the age of thirteen and, in 1993, while living with a man who had a history of alcohol abuse and domestic violence, lost custody of her first child as a result of issues that alcohol and domestic violence produced.

The mother also lost parental rights to her second child for essentially the same reasons. She and that child's father, another man with a history of alcohol abuse and domestic violence, were unable to resolve continuing conflicts, substance abuse, and domestic violence issues over the course of more than four years while they were together.[3] To her credit, however, the mother attended some detoxification programs and Alcoholics Anonymous meetings during this period and attained some sobriety.[4]

Notwithstanding her efforts at sobriety, alcohol abuse and domestic violence continued their role in the mother's life. Shortly after losing custody of her second child, the mother met a recovering alcoholic and drug addict, whom we shall call Frank, moved in with him, and ultimately married him, though he, too, was physically abusive towards her. During her cohabitation with Frank, the mother relapsed and began drinking again, in part because of Frank's extramarital affairs.

While living with Frank, the mother allowed the man who would become Tia's father, whom she had only recently met, to move into the marital home, although Frank was very sick with hepatitis C and cirrhosis. Four months after the father moved in, Frank died.

[2]The child's father entered into a stipulation for judgment terminating his parental rights in September, 2006, and entered into an agreement with the child's foster family for postadoption contact.

[3]The second child was removed from the mother's custody after the child's father beat the mother badly, breaking her thumb and two toes.

[4]The mother's testimony as to her period of sobriety varied throughout the trial but it appears that she was sober for at least a few years after losing custody of her second child and that she also had remained sober for a portion of her first pregnancy, for one month after the birth of her first child, and for some number of years in her twenties.

During the months that followed, police responded to several reports of disturbances, verbal arguments, and unwanted persons at the home the mother shared with the father. During one incident, the mother tried to call the police, but the father unplugged the telephone to prevent her from doing so. Somehow, the mother managed to hit a "panic button" in the house that summoned police. When the police arrived, the father threw the mother against the door to block their entry. Despite these repeated domestic disputes, the mother allowed the father to remain in her home. She even allowed him to return to the house after he served three and one-half months in jail for violating a restraining order she had taken out against him.

At some point during her dispute-filled relationship with the father, the mother became pregnant with Tia, and gave birth two months after the father's release from jail. Three days after Tia's birth, however, DCF received a G. L. c. 119, § 51A, report alleging neglect of Tia. The report was based on arguments between the mother and father during the mother's and Tia's stay at the hospital, arguments so substantial that hospital security was twice called to the mother's room to deal with them.

DCF investigated the § 51A report and found it supported. Based upon the parents' conduct in the hospital, their history of domestic violence, their mental health histories, and their history of neglect and abuse of other children, DCF assumed custody of Tia and placed her in a foster family with one of the mother's other children.

Thereafter, the mother began therapy, and initially maintained strong attendance. Despite her attendance, however, the mother was not able to apply what she learned and continued her pattern of choosing abusive partners. Four months after Tia's removal, the mother brought her new, and, as it would turn out, abusive, boyfriend — we shall call him Charles — to a supervised visit with Tia. Ultimately, it turned out that Charles's residence in the mother's home delayed parent-child home visits for two months.

In addition to her continual association with abusive men, the mother otherwise repeatedly demonstrated her inability to care for Tia, in one instance declaring, "I'm so sick and weak; no f———— way I can care for her." The mother frequently complained about feeling ill and having various problems that pre-

vented her from visiting with Tia or taking care of her. The mother also expressed suicidal feelings, and, at least on one occasion, claimed to lack sufficient money to buy Tia food, even though she always had enough money to keep herself supplied with cigarettes.[5]

In spite of ongoing issues and setbacks, DCF agreed to place Tia in the mother's home for a one-month transition period aimed at total reunification. During this one-month period, however, the mother constantly called the foster mother for weekend respite breaks, sometimes declaring that she was sick, sometimes expressing her inability to care for Tia, and sometimes claiming she was sick of Tia and "needed a break." Indeed, on one occasion, the mother told the foster mother, "If I had my way, you could keep her forever."

The events that led DCF to change the goal from reunification to adoption began with the mother's telephone call to DCF to report that she was sick, having difficulty caring for Tia, and needed an overnight respite. The foster mother agreed to provide that respite and picked Tia up at the mother's house, where, without success, the mother urged the foster mother to keep Tia an additional night, saying that, if she did, DCF would never know. When the foster mother returned Tia to the mother's home the following evening as scheduled, she found the mother dressed in attire far more polished than usual and saw six or seven cars parked in her yard.

When the foster mother returned Tia to the mother, she told the mother that Tia was running a fever and had a rash. The next day, however, the foster mother received a telephone call from the mother who said that she was at a nearby mall. The mother reported that she was so sick that she had to go to an emergency room immediately and therefore needed the foster mother to take Tia. The foster mother picked up Tia at the mother's home and notified DCF that she had done so, thereby triggering contact between a social worker and the mother during which the mother told the social worker a series of conflicting stories about why she had asked the foster mother to take Tia.

---

[5]The mother smoked in the house even though Tia wheezed around her, a fact that the judge noted as an example of the mother's inability or unwillingness to care for Tia properly.

In any event, when the foster mother picked Tia up, she observed that Tia's nose was "caked with mucus," that she was congested, and that she was running a fever. Two days later, when Tia's condition had not improved, the foster mother took her to a doctor who diagnosed her as having bronchitis. At that point, DCF abandoned the reunification plan and began to focus on adoption.

On the basis of that evidence, the judge ruled that the mother lacked "the ability, capacity, fitness and readiness to assume parental responsibility" for Tia and that DCF's plan for adoption was appropriate. While the judge made a number of findings and rulings that support her conclusion in that regard, the following ruling articulates the essential basis for her ultimate judgment:

> "Sadly, this court finds that while [the] mother asserts her desire to have custody of [Tia], her actions and emotions indicate she knows she is not able to parent this child consistently and safely. [The mother] repeatedly acknowledged her inability to be a parent '24-7' to both the foster mother and [DCF,] asking for 'respite' each occasion that [Tia] was with her for more than a few days. Additionally, [the] mother's interactions with [Tia] are striking for their apparent lack of emotional attachment to her. I find it notable that [the] mother never used the child's name over the course of three days testimony, only referring to [Tia] as 'the baby' or 'my baby.' While the court would acknowledge the mother in her own way loves this child, it is apparent that [the mother's] desire to prove her ability to parent [Tia] far exceeds her ability to do so."

As noted earlier, the mother focuses her appellate argument on comments the judge made early in the trial, as well as her substantial use of DCF's proposed findings of fact, claiming that, in combination, the judge's comments and her use of the proposed findings deprived her of a fair trial.

The judge's comments are, indeed, quite troubling. The overall trial lasted nine days and involved the testimony of nine witnesses, the mother included. The mother was the only witness during the first four trial days. As the second day of trial began, the judge, from the bench, broached the idea of settlement, say-

ing, "[I]n the spirit of negotiation, I asked [DCF] . . . if there was a proposal that they could make to the mother." Without waiting for an answer, she then began to outline the reasons that, in her view, made the mother's consideration of settlement worthwhile:

> "Now, I know that we're in the middle of this hearing, and I know that there's still more evidence scheduled. However — and I know too that on a personal level, that [the] mother has been trying extremely hard, and has been making in her own personal life some very significant gains, okay? But what I do know also, from at least the evidence that I've received, and also what's gone on when I've been on this case, is that [DCF] did in fact attempt reunification with the mother. It was not that long ago; it was subsequent to some changes; and that's going to be a very, very significant fact, along with past history. . . .

> "I don't know if [the mother] realized [when she was on the witness stand during the first day of trial] that she was testifying to, over and over again, a very similar pattern in her life, and the pattern has not significantly changed for any significant length of time, in terms of human behavior and what this Court knows in its own experience.

> "In the meantime, this child is bonding with a relative. It's a significant — it's a significant thing that the Court has to consider.

> "And so I just ask you [the mother's attorney], if you have talked to your client about it, because if she puts this in my hands — and I mean, I'm going to hear more; I'm open to finishing this trial and hearing all the evidence. As you know, I'm available, etc.

> "       . . .

> "So while I haven't — I haven't heard all the evidence, and I haven't made my decision, I just think that factually and legally, there [are] many things that [DCF] has already put into evidence that weigh very strongly here with the Court.

> "       . . .

"And I believe she — there would be testimony, even if she didn't acknowledge it — and we haven't gotten to that point yet — but: She really couldn't handle it 24/7. And that's what this is all about: It's 24/7, day in and day out. This child really needs that, deserves it, and legally deserves it, as well as practically.

"So those are the considerations that I see, and I have great respect for knowing what [the] mother's life has been like, and how she's tried to pull herself up from the bootstraps. But that's about her, and it's not necessarily at the point where she could give consistent, permanent care, custody, that's necessary and obligatory upon a parent.

"So I guess I wanted to know — after this speech — whether or not [the] mother has taken any time to think about that. If she still wants to put this decision in my hand. I don't know if you need — if you want to talk to her or . . . ."

We understand that the instinct leading the judge to make the quoted remarks flowed in all likelihood from one or more benevolent sources. Settlements conserve public resources. Settlement of a case where a child's placement is at issue avoids a lengthy appellate process and permits a permanent placement at a time when permanence matters most. And settlement may allow a parent who perhaps will lose everything after trial to preserve at least some shred of the parent-child relationship.

Notwithstanding the benevolent impulse that produced them, the judge's comments were weighted assessments of evidence, not simply issue-spotting alerts. The judge should not have made them and, in doing so, departed from her appropriate role, both in assessing the strength of the evidence well before the evidence had closed and in trying to urge consideration of a settlement in a case where she was the ultimate fact finder.[6]

Decided cases make it abundantly clear that the finder of fact must keep an open mind until all the evidence is presented and

_____

[6]Indeed, eight years ago, the Supreme Judicial Court told the judge that she "should have refrained from making comments about the strength of the evidence she had just heard" under similar circumstances in a similar case. *Adoption of Georgia*, 433 Mass. 62, 65 (2000).

both sides have rested. Juries are routinely reminded of their obligations in that regard. Cf. *Commonwealth* v. *Benjamin*, 369 Mass. 770, 772 (1976). The requirement for open-mindedness is equally important when a case is tried without a jury. Thus, in *Commonwealth* v. *Coleman*, 390 Mass. 797, 802-803 (1984), the Supreme Judicial Court labeled a judge's comment during sentencing that he made his findings prior to the close of all evidence "ill-advised" and "highly inappropriate." And in *Preston* v. *Peck*, 271 Mass. 159, 163 (1930), the court reversed a judgment after a judge stated that he "made up" his mind before the evidence concluded. In doing so, the court said that a judge's duty to "hear all competent evidence requires as a necessary incident of that duty that he [or she] shall hear the evidence with an open mind and not reach a final conclusion upon the issue until he [or she] has heard all evidence bearing upon it which a party is prepared to offer and has a right to introduce." *Id.* at 163-164. If a judge does otherwise and "reaches a decision on an issue of fact before the testimony of that issue is completed and thus closes his [or her] mind to a fair consideration of competent evidence not yet heard, he [or she] has deprived the party of his [or her] right to a full and fair hearing upon the whole evidence." *Id.* at 164. See *Union Trust Co.* v. *Magenis*, 266 Mass. 363, 365 (1929).

To be sure, the judge said that she had not made a final decision and that she anticipated hearing more evidence before she did. Those comments, no doubt, were designed to reassure the mother that the judge would in fact be fair. But fairness in fact is not enough. Our decisions and those of the Supreme Judicial Court have commented often and in a variety of contexts on the importance of maintaining not only fairness but also the appearance of fairness in every judicial proceeding. See *Selectmen of Barnstable* v. *Alcoholic Bevs. Control Commn.*, 373 Mass. 708, 718 (1977) (noting that preservation of appearance of fairness is appropriate consideration in administrative proceedings); *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 4 (1979) (indigent parents have constitutional right to counsel before hearing on termination of their parental rights because, among other things, "[t]he appearance of counsel for the parties . . . enhances the appearance of fairness in the trial process"); *Furtado* v. *Furtado*, 380 Mass. 137, 151 (1980); *Commonwealth* v. *Jordan*, 49 Mass.

App. Ct. 802, 811 (2000), quoting from *Wheat* v. *United States*, 486 U.S. 153, 160 (1988) ("the judge has an 'independent interest in ensuring . . . that legal proceedings appear fair to all who observe them' "). See also *Commonwealth* v. *Henriquez*, 440 Mass. 1015, 1016-1017 (2003) (remanding case for resentencing before different judge principally to preserve appearance of impartiality).

The appearance of fairness is almost invariably undercut by a premature assessment of the strength of one party's case like the assessment the judge made here. That is particularly true when, as in this case, the premature assessment carries through into the final judgment, in the process giving a reasonable observer cause to wonder whether the way the judge viewed the evidence, and the inferences she drew from it, were produced by her early judgment rather than by a thoughtful and careful weighing of all the evidence at the end of the trial.

Adding to those difficulties is the fact that, in this case, the judge's premature assessment occurred in the course of her effort to convince the mother that she should settle the case. Where, as here, the judge is the fact finder, participation in fostering settlement entails great risk that the judge will lose impartiality or expose herself in an inappropriate way to disputed matters the trial will involve. See *Furtado* v. *Furtado*, *supra* at 151-152. At the very least, a judge responsible for finding the facts who uses judicial power in an effort to "coerce settlements from recalcitrant parties" runs the risk of losing the "appearance, as well as the substance, of open-mindedness." *Graizzaro* v. *Graizzaro*, 36 Mass. App. Ct. 911, 912 (1994).

A fact-finding judge ought to use great caution before proffering settlement suggestions in every case, but it is particularly important that she do so in cases involving issues as emotional and difficult as the issues in this one. No matter how poor the parenting effort has been, the prospect of a judicial order permanently severing the parent-child relationship inevitably produces strong emotions. If an order terminating that relationship is entered, the parent against whom it runs is at least entitled to walk away from the court house unsaddled by the burden of wondering, perhaps for years, whether the outcome was produced, even partially, by her failure to yield to a judge's settlement entreaties.

The considerations outlined above have accompanied our careful review of the transcript of the testimony and the exhibits introduced during the course of the trial. In our considered judgment, that evidence could lead only to the result the judge reached here. The judge's extensive findings of fact and conclusions of law, findings and conclusions based on, but by no means blindly following, DCF's requests, laid out in clear and compelling fashion the nature and extent of the mother's unfitness and why DCF's plan for adoption was in Tia's best interests. Accordingly, although the judge was wrong to make her premature assessment of the evidence and inject the topic of settlement into a case where she was the finder of fact, and although those lapses might well have led to reversal in a closer case, the evidence in this case so substantially supported the judge's findings and conclusions that the mistakes do not warrant reversal.

*Decree affirmed.*