DORETTA, CARE AND PROTECTION OF, 101 Mass. App. Ct. 584

 
 CARE AND PROTECTION OF DORETTA & others. [Note 1]

101 Mass. App. Ct. 584
 May 6, 2022 - August 30, 2022

Court Below: Juvenile Court, Hampden County
Present: Desmond, Ditkoff, & Walsh, JJ.

 

No. 22-P-121.

Department of Children & Families. Minor, Care and protection. Parent and Child, Care and protection of minor. Due Process of Law, Care and protection of minor. Evidence, Hearsay. Practice, Civil, Care and protection proceeding, Affidavit, Bias of judge.

Discussion of the standard of review of a judge's decision awarding temporary custody of a child to the Department of Children and Families (department) following a so-called seventy-two hour hearing held after the department's removal of a child into temporary custody and filing of a care and protection petition, i.e., a fair preponderance of the evidence that the child is suffering from serious abuse or neglect or is in immediate danger of serious abuse or neglect and that immediate removal of the child is necessary to protect the child from serious abuse or neglect. [588-589]

At a care and protection proceeding, the affidavits by a social worker that were filed with the petition of the Department of Children and Families (department) for temporary custody were not categorically inadmissible at the temporary custody hearing and could be admitted to the extent that, as to the first- and second-level hearsay contained therein, the hearsay source was specifically identified in the document and was available for cross-examination, should the party challenging the evidence have requested to do so [589-591]; further, the failure of the parents and children, upon learning of the unavailability of the social worker to testify at the temporary custody hearing, to preserve their hearsay challenge by objecting to statements that had earlier been challenged as hearsay or respond to the judge's offer to subpoena the social worker, or to object to the extent of the redactions made by the judge or propose different redactions, waived their objection and the statements retained their full probative force [591-592].

At a care and protection proceeding, the evidence at the temporary custody hearing allowed the judge to find that the parents were unable to provide appropriate care to the children and unwilling to obtain and accept services offered to them for the benefit of the children; accordingly, in light of the children's special needs and the parents' inability to provide for them and refusal to accept services, there was adequate support for the judge's finding that the Department of Children and Families had shown by a preponderance of the evidence that the children had been subjected to serious abuse or neglect and would be in immediate danger of serious abuse or neglect if 

 Page 585 

returned to their parents. [592-594]

At a care and protection proceeding, the judge acted within her discretion, and within constitutional bounds, in intermittently limiting the father's participation at the temporary custody hearing, which took place through an Internet-based video conferencing platform, where the challenged measures addressed the father's ongoing disregard for the judge's instructions and not his legal position, and where the father was not prejudiced by the judge's actions, given that the father had an opportunity to be heard at a meaningful time and in a meaningful manner [594-595]; further, this court rejected any challenge based on the private, inadvertently recorded and transcribed conversation between the judge and her session clerk, and stated that, in any event, the judge's statements (even if reflecting a hint of irritation) did not reflect judicial bias or premature conclusions, but rather, preliminary thoughts on witness credibility (a matter well within the judge's role) [595-596].

Petition filed in the Hampden County Division of the Juvenile Court Department on September 7, 2021.

 A hearing on the extension of temporary custody was had before Patricia M. Dunbar, J.

 A proceeding for interlocutory review was considered in the Appeals Court by Singh, J., a motion for reconsideration was considered by her, and the case was reported by her to the Appeals Court.

 Cara M. Cheyette for the children.

 Dana C. Chenevert for the father.

 Jeanne M. Kaiser for the mother.

 Kristin Stone Braithwaite for Department of Children and Families.

 DITKOFF, J. The mother, father, and three children appeal from an order issued by a Juvenile Court judge granting temporary custody of the children to the Department of Children and Families (DCF). We conclude that affidavits filed with DCF's petition for temporary custody are not categorically inadmissible at a temporary custody hearing and may be admitted to the extent permitted by Adoption of Luc, 484 Mass. 139, 151-153 (2020). Further concluding that there was sufficient evidence that the children were in immediate danger of serious abuse or neglect if returned to the parents and that the judge did not deprive the father of due process by briefly limiting his participation in the proceedings when the father was disruptive, we affirm the order of temporary custody.

 1. Background. a. The family. This appeal involves the parents' 

 Page 586 

three children: Doretta, Daniel, and Erik. [Note 2] Doretta is twelve years old. Daniel and Erik are eleven year old twins. All three children have autism spectrum disorder. Daniel is "severely autistic." He is nonverbal and cannot use the bathroom on his own. Daniel also suffers from a mood disorder, anxiety, and attention deficit hyperactivity disorder. Erik and Doretta, on the other hand, are "high functioning." 

 b. Incidents. Daniel has hit his head on walls, bitten his father and Erik, pulled his siblings' and the mother's hair, pulled out his own hair, and hit a MassHealth driver. The father reported that conduct like this is "a daily occurrence and there is nothing they can do to stop [Daniel]."

 In August 2014, personnel at a camp Daniel was attending observed a burn on his body. In October or November 2014, one of the children pushed the mother, breaking her back. In December 2019, Daniel's in-home therapist reported that Daniel runs from the home with no one able to retrieve him. Later that month, after a judge awarded temporary custody to DCF, DCF removed all three children from the home. Several days later, Erik explained "bruising and scarring" on his body by saying that Daniel bites him. DCF returned the children to the parents in March 2020.

 In July 2020, a neighbor reported that Daniel had broken into their home three times over the past few months and, this time, had gone in their pool. In December 2020, Daniel punched a window while he was playing outside, requiring stitches. On another occasion, a doctor removed three of Daniel's teeth because he had been punching himself in the face.

 In September 2021, the parents' utility company shut off the electricity in the home. As the parents drove the children to another location, Daniel got upset and punched himself in the face multiple times, causing bruising and hemorrhaging around his eyes. One to three days later, the father notified Daniel's pediatrician. [Note 3] The pediatrician suggested that the father bring Daniel to be seen. The father said that he could not do so because 

 Page 587 

he and the mother "couldn't safely transport [Daniel]." [Note 4]

 c. Education. All three children were in an educational program for students with autism at a public school. In spring 2020, the children's school switched to a virtual learning program because of the COVID-19 pandemic. Daniel struggled with virtual learning and became frustrated because he wanted to play outside. His frustration led him to break five computers, some of which were for his siblings' use.

 In January 2021, at the father's request, the public school system moved Daniel to an in-person program at a private school. Daniel attended this school for a few days, until it closed for two weeks because of a COVID-19 outbreak. When the private school reopened, the father refused to send Daniel back. Nonetheless, he did not reengage Daniel in his public school's virtual learning program, in which Daniel was still enrolled. Instead, the father began reading Erik's school work to Daniel at home, despite the father's not having requested approval or guidance for "home schooling" Daniel. The father continued to ignore school officials' urging that Daniel's disabilities were "so significant" that he needed to attend school in person.

 During this time, Erik and Doretta attended the public school's virtual learning program. On December 17, 2020, the children's principal told DCF that Erik and Doretta were "barely attending [the virtual learning program] and [were] missing many assignments." Despite this report, the special education supervisor at the children's school testified that Erik and Doretta's attendance was "good" during the 2020-2021 school year and that they "missed about five days when they were enrolled in the virtual academy." The father refused to send the children back to school in person when the school reopened for in-person learning in April 2021.

 d. Parents' refusal to cooperate. When providers, school officials, or DCF workers tried to talk to the father, he stated that the services being offered were inadequate, reiterated that his family's needs were going unmet, requested services that the person to whom he was speaking could not offer, demanded an attorney, spoke over others, appeared "erratic and volatile," talked about societal issues such as racism and xenophobia, and blamed DCF 

 Page 588 

for issues beyond its control. The parents have refused to work with DCF in any capacity, and have forbidden DCF workers entry into the home. When DCF tried to offer services to the father, the father regularly refused to provide the necessary information.

 e. Proceedings. On September 7, 2021, DCF filed a care and protection petition on behalf of the children. After an emergency hearing, a judge ordered that the children remain in the parents' custody, conditioned on the parents' cooperation with DCF. On September 17, 2021, DCF filed an emergency motion for temporary custody and removed the children from the home. On December 14, 2021, [Note 5] after a seventy-two hour hearing, the judge granted temporary custody of the children to DCF. The judge did not make written findings. The parents and children filed a joint petition for interlocutory review under G. L. c. 231, § 118. The single justice ultimately exercised her discretion to allow the parents and children leave to pursue an interlocutory appeal of the order of temporary custody. See Caffyn v. Caffyn, 441 Mass. 487, 488 (2004); Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 21 (1981).

 2. Standard of review. "When [DCF] 'has reasonable cause to believe a child's health or safety is in immediate danger' and 'removal is necessary to protect the child from abuse or neglect,' it shall immediately take the child into temporary custody." Care & Protection of Rashida, 488 Mass. 217, 219 (2021) (Rashida I), S.C., 489 Mass. 128 (2022), quoting G. L. c. 119, § 51B (c), (e). Within twenty-four hours of removal, DCF must file a care and protection petition. See G. L. c. 119, § 51B (e); Rashida I, supra. "On the day a petition is filed, a judge will conduct an emergency hearing." Rashida I, supra, quoting Care & Protection of Walt, 478 Mass. 212, 220 (2017). Within seventy-two hours of the filing of the petition and the emergency hearing, a judge must hold a second hearing (seventy-two hour hearing) "to determine whether temporary custody of the child will continue" beyond seventy-two hours. Rashida I, supra.

 After the seventy-two-hour hearing, a judge may award temporary custody of a child to DCF if the judge finds that DCF has proved by a "'fair preponderance of the evidence' that a child is 'suffering from serious abuse or neglect or is in immediate danger 

 Page 589 

of serious abuse or neglect and that immediate removal of the child is necessary to protect the child from serious abuse or neglect.'" Care & Protection of Sophie, 449 Mass. 100, 111 (2007), quoting G. L. c. 119, § 24. We will not disturb a judge's ruling simply because a party "views the evidence differently from how the judge viewed it." Adoption of Lisette, 93 Mass. App. Ct. 284, 295 (2018). In the context of a seventy-two hour hearing, "the principal interest at stake is the child's immediate welfare." Care & Protection of Perry, 438 Mass. 1014, 1014 (2003). Thus, "the child's interest in freedom from abuse and neglect takes precedence over the child's interest in family integrity." Care & Protection of Robert, 408 Mass. 52, 62 (1990).

 Here, the judge properly construed DCF's burden of proof. Her reference to a "low" standard merely reflects our law that, because "the stakes and purposes of the seventy-two hour hearing and the trial on the merits differ," Care & Protection of Orazio, 68 Mass. App. Ct. 213, 219 (2007), "[a] less demanding standard of proof is required" at a seventy-two hour hearing, Care & Protection of Robert, 408 Mass. at 68, and a "higher standard of proof . . . governs the latter," Care & Protection of Orazio, supra.

 3. Admissibility of social worker affidavits filed with a petition for temporary custody. a. Overview. The parents filed motions in limine objecting to the admission of affidavits by the DCF social worker on two grounds: (1) that the affidavits were inadmissible because they were pleadings, and (2) that portions of the affidavits contained inadmissible hearsay. The judge rejected the first argument out of hand. The judge deferred the second argument because she expected the social worker to testify. When the social worker ultimately did not testify, the judge admitted the affidavits with extensive redactions of hearsay.

 b. Admissibility of affidavits filed with a pleading. By law, when DCF takes emergency custody of a child, it is required to "make a written report stating the reasons for such removal and shall file a care and protection petition under [G. L. c. 119, § 24,] on the next court day." G. L. c. 119, § 51B (c), (e). See Adoption of Luc, 484 Mass. at 142. By regulation, the written report must be filed with the petition. 110 Code Mass. Regs. § 4.29(3) (2009). Accord Rule 7(B) of the Juvenile Court Rules for the Care and Protection of Children (most motions must be "accompanied by an affidavit signed by the person with personal knowledge of the factual basis of the motion"). Here, DCF had already filed a care and protection petition prior to the emergency removal. Accordingly, 

 Page 590 

when DCF filed its motion for temporary custody, it attached the written report of the social worker.

 General Laws c. 231, § 87, provides that "pleadings shall not be evidence on the trial, but the allegations therein shall bind the party making them." Most of the case law regarding this statute revolves around the extent to which parties are bound by their pleadings. See, e.g., Honey Dew Assocs. v. Creighton Muscato Enters., 73 Mass. App. Ct. 846, 853 (2009); Boston Police Patrolmen's Ass'n v. Boston, 60 Mass. App. Ct. 672, 675 (2004). For example, a party is not bound by a pleading in a case other than the one in which the pleading was filed. See Hibernia Sav. Bank v. Bomba, 35 Mass. App. Ct. 378, 384 (1993). Furthermore, a party is generally bound only by allegations of fact in pleadings, see Wood v. Roy Lapidus, Inc., 10 Mass. App. Ct. 761, 765 (1980), but a party may be bound by an allegation in a pleading concerning a mixed question of fact and law, see Maker v. Bermingham, 32 Mass. App. Ct. 971, 973 (1992).

 Beyond that, the purpose of this provision was to eliminate the practice of using the differences between amended and unamended complaints or other pleadings to show falsity. See Fellows, Gamage Co. v. Jackman, 296 Mass. 570, 573 (1937) ("a statement of fact contained in a pleading before amendment, inconsistent with an allegation in the amended pleading, cannot be introduced as an admission that the latter is untrue"). Accord Harrington v. Metropolitan Transit Auth., 345 Mass. 371, 373 (1963) (specifications in complaint prior to amendment could not be used to impeach witness); Stoney v. Soar, 322 Mass. 408, 412 (1948) (original declaration and amended declaration inadmissible to show declarant's lack of credibility); Herman v. Fine, 314 Mass. 67, 69 (1943) (affirmative defenses cannot be used to prove plaintiff's case); Cheschi v. Boston Edison Co., 39 Mass. App. Ct. 133, 138 n.6 (1995) (party may not read in evidence unverified answer in pleadings).

 Nothing in G. L. c. 231, § 87, supports the assertion that materials submitted with a pleading thereby become categorically inadmissible. Indeed, it is common for important documents to be attached to complaints. See, e.g., Atchue v. Benchmark Senior Living LLC, 98 Mass. App. Ct. 572, 573 (2020) (G. L. c. 93A demand letter attached to complaint); Ferguson v. Maxim, 96 Mass. App. Ct. 385, 392 (2019) (offer allegedly constituting binding contract attached to complaint); Ressler v. Deutsche Bank Trust Co. Ams., 92 Mass. App. Ct. 502, 503 (2017) (mortgage and note 

 Page 591 

attached to complaint); New England Insulation Co. v. Liberty Mut. Ins. Co., 83 Mass. App. Ct. 631, 633 (2013) (insurance contract attached to complaint). Such documents are not thereafter categorically inadmissible. Rather, the admissibility of any document attached to a pleading is governed by the ordinary rules of evidence.

 Our opinion in Guardianship of A.R., 99 Mass. App. Ct. 349 (2021), confirms this understanding. We rejected the proposition that the medical certificate required to be filed with a petition for appointment of a guardian for an incapacitated person is admissible because it must be filed. See id. at 354. We did not, however, conclude that the mere fact that it was attached to a pleading made it inadmissible. Rather, we concluded that the certificate was inadmissible because it was "hearsay, not subject to any exception" (footnote omitted). Id. at 356. Accord Cannata v. Berkshire Natural Resources Council, Inc., 73 Mass. App. Ct. 789, 792 (2009) (verified complaint is "treated as an affidavit for purposes of [Mass. R. Civ. P. 56 (e), 365 Mass. 825 (1974)]").

 Furthermore, the Supreme Judicial Court has repeatedly held that court investigator reports under G. L. c. 119, § 24, are admissible in evidence, at least to the extent that second-level hearsay is limited to factual information collected from identified sources available for examination. See, e.g., Adoption of Luc, 484 Mass. at 149-150; Care & Protection of Erin, 443 Mass. 567, 573 n.5 (2005). Such documents are required to "be attached to the petition" for care and protection. G. L. c. 119, § 24.

 Here, at least parts of the affidavits were admissible under the rules of evidence applicable to care and protection proceedings. "Subject to specific limitations, reports prepared by the department's 'investigation of the facts relating to the welfare of the child' may be admitted in evidence at the discretion of the judge." Care & Protection of Zita, 455 Mass. 272, 280 (2009), quoting G. L. c. 119, § 21A. Specifically, "first- and second-level hearsay contained within DCF reports and official DCF records is admissible for statements of primary fact, so long as the hearsay source is specifically identified in the document and is available for cross-examination, should the party challenging the evidence request to do so" (footnotes omitted). Adoption of Luc, $no$484 Mass. at 153. Accord Mass. G. Evid. § 1115 (2022). Accordingly, the affidavits by the social worker were admissible to the extent that the information therein complied with the Luc criteria.

 c. Hearsay. Although the judge rejected out of hand the parents' argument that the affidavits were categorically inadmissible 

 Page 592 

as pleadings, the judge tentatively denied the hearsay objection on the ground that the social worker was expected to testify. As it turned out, the social worker was unavailable during the temporary custody hearing, and the judge denied DCF's motion to continue the hearing until he was available. On learning this, the parents and the children did not object to the statements previously challenged as hearsay or respond to the judge's offer to subpoena the social worker. Nonetheless, with the social worker unavailable, the judge redacted portions of the affidavits before admitting them as exhibits. There is no indication in the record that the parents or children objected to the extent of the redactions or proposed different redactions. As the parents and children concede, they did not preserve their hearsay argument. "The consequence of such a failure to object is to waive the objection to the [evidence] and the statements retained their 'full probative force.'" Adoption of Kimberly, 414 Mass. 526, 534-535 (1993), quoting Freyermuth v. Lutfy, 376 Mass. 612, 617 (1978). Accord Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021); Adoption of Bea, 97 Mass. App. Ct. 416, 424 (2020). [Note 6]

 4. Sufficiency of the evidence. The evidence at the temporary custody hearing allowed the judge to find that the parents were unable to provide appropriate care to the children and unwilling to obtain and accept services offered to them for the benefit of the children. Most disturbing is the evidence regarding Daniel. Daniel has had almost no formal schooling since the COVID-19 pandemic began, largely because the father refused to send Daniel to a specialized in-person program at a private school or to engage him in the virtual learning program offered by his public school. The father repeatedly refused behavioral services offered by the school system for Daniel. See Adoption of Luc, 484 Mass. at 145 ("The mother's failure to engage her other children consistently in early intervention services is particularly notable here, where Luc had cognitive, social, and motor skills deficits").

 Similarly, it is evident that proper fencing is needed for Daniel to play outside safely. Even though the Department of Developmental 

 Page 593 

Services offered funding for a fence, the father rejected the offer and failed to complete the necessary steps to move forward. Effectively confined to the house, Daniel continued to have aggressive outbursts. See Adoption of Quentin, 424 Mass. 882, 888 (1997) (judge heard testimony that "the mother would have difficulty caring for special needs children"); Adoption of Ulrich, 94 Mass. App. Ct. 668, 678 (2019) (child's heightened needs are relevant to question of parental fitness).

 The parents also refused other services offered to Daniel. The father ignored Daniel's pediatrician's advice that Daniel see an endocrinologist. See Adoption of Lisette, 93 Mass. App. Ct. at 295 (affirming termination decree under clear and convincing evidence standard where judge found that mother "does not fully understand the scope of [the child's] medical issues as she did not think that it was important to meet with his dietician[] or obtain the necessary [medical equipment]" [footnote omitted]). The father refused to attend a meeting coordinated by DCF to discuss intensive care coordination services for Daniel, even though the father testified that Daniel needed such services.

 Moreover, the father repeatedly told DCF that "neither he nor his wife can physically manage [Daniel's] aggressive behaviors in the home" and that "the behavioral issues were very difficult to manage" and testified that multiple caretakers were needed to care for Daniel. Although the father testified that he had obtained the services of caretakers, the judge would have been well justified in discrediting this testimony, as the father refused to disclose their identities, the number of such caretakers changed from telling to telling, and only one had been seen by others.

 The evidence also supported similar neglect of Doretta and Erik. In December 2020, their school principal reported that they were "barely attending [virtual school] and [were] missing many assignments." [Note 7] The special education supervisor at their school testified that their participation in school was hindered by their home life and by Daniel's behavior. Nonetheless, the parents refused to update any of the children's individualized educational programs (IEPs), requiring the school to use old IEPs not tailored to the children's current needs. When school officials tried to discuss the children's IEPs with the father, the conversation was off-topic and unproductive.

 Page 594 

 The father also refused medical care for the children. When he suspected they had COVID-19, he ignored medical advice to bring them to the pediatrician. When the pediatrician instructed the father to bring the children into the office for physicals, he refused, demanding instead a virtual visit. When the pediatrician's office tried to schedule necessary medical appointments, the father went "off script" and talked instead about "atrocities that [the family has] experienced." See Adoption of Lisette, 93 Mass. App. Ct. at 295.

 Erik's therapist reported that the father discusses inappropriately weighty subjects such as deportation risks and the possibility of removal by DCF in front of the children. See Adoption of Yvonne, 99 Mass. App. Ct. 574, 580 (2021) (judge properly considered mother's "difficulty handling her frustrations with [DCF] in front of the children"); Adoption of Querida, 94 Mass. App. Ct. 771, 779 (2019) ("During supervised visits, the mother was unable to control her anger and emotions, and raised inappropriate topics with the children").

 In light of the children's special needs and the parents' inability to provide for them and refusal to accept services, there was adequate support for the judge's finding that DCF had shown by a preponderance of the evidence that the children had been subjected to serious abuse or neglect and would "be in immediate danger of serious abuse or neglect if returned to [their] parents." Care & Protection of Perry, 438 Mass. at 1014.

 5. Due process. a. Hearing. The judge acted within her discretion, and within constitutional bounds, in intermittently limiting the father's participation at the hearing, which took place through an Internet-based video conferencing platform. Throughout the hearing, the father spoke over attorneys, testified nonresponsively, and interrupted other witnesses' testimony. At points, the father (represented by counsel) asked to speak for one-half hour, told the judge that she was "[v]ery wrong," asked the judge to make a ruling by the next day and return the children before Thanksgiving, asked to object, sought a recess to address health problems caused by his hunger strike, [Note 8] asked the judge to turn off a witness's camera because it upset the parents to see him, interrupted his attorney's closing argument, and interrupted DCF's 

 Page 595 

closing argument several times by saying, "DCF lies." Despite the above, the judge remained patient, frequently reinstructing the father and inviting objections from counsel. Only after the father continued to speak over the judge did she briefly mute him. After, the father simply unmuted himself. Similarly, the judge removed the father from the virtual hearing briefly and only after DCF had rested.

 The judge has discretion to regulate proceedings, particularly in custody matters. See Adoption of Patty, 489 Mass. 630, 647-648 (2022) (judge may designate steps to take if parent disconnected from trial); Adoption of Roni, 56 Mass. App. Ct. 52, 57 (2002) (judge acted within her discretion in excluding parents from court room during children's testimony). Here, the challenged measures addressed the father's ongoing disregard for the judge's instructions, not his legal position.

 Moreover, the father was not prejudiced by the judge's actions, as "the father had an opportunity to be heard at a meaningful time and in a meaningful manner." Care & Protection of Quinn, 54 Mass. App. Ct. 117, 122 (2002). Contrast Adoption of Patty, 489 Mass. at 647-648 (mother was deprived of due process where, after being disconnected from virtual trial, she "only heard a portion of the testimony of one of [the] witnesses, if that," and "missed the entire testimony of the next two witnesses"). When the father was ejected, he had already testified extensively and cross-examined witnesses. See id. at 638, quoting Adoption of Mary, 414 Mass. 705, 710 (1993) ("due process requires that parents . . . 'have an opportunity effectively to rebut adverse allegations concerning child-rearing capabilities'"). In addition, his attorney remained in the hearing. See Adoption of Jacob, 99 Mass. App. Ct. 258, 271 (2021) ("Much of the testimony taken outside of the grandparents' presence was cumulative of testimony offered while they were in the court room or their attorney was present").

 b. Judge's statements. We also reject any challenge based on the private, inadvertently recorded and transcribed conversation between the judge and her session clerk. As the parents and children admit, the judge likely did not intend to share with the litigants the contents of her private conversation. Had the parties sought this information, it would have been protected by the judicial deliberative privilege. See Matter of the Enforcement of a Subpoena, 463 Mass. 162, 169 (2012), quoting Matter of Curry, 450 Mass. 503, 526 (2008) ("'the administration of justice' . . . requires 'respect for the internal deliberations and processes that 

 Page 596 

form the basis of judicial decisions, at very least while the matter is still pending'"). A judge is entitled to have confidential discussions with court personnel.

 In any event, the judge's statements do not reflect judicial bias. "[T]he finder of fact must keep an open mind until all the evidence is presented and both sides have rested." Adoption of Tia, 73 Mass. App. Ct. 115, 121-122 (2008). The judge's statements do not reflect premature conclusions, but rather, preliminary thoughts on witness credibility, a matter well within the judge's role. Contrast id. at 121 (judge "assess[ed] the strength of the evidence well before the evidence had closed" and "urge[d]" settlement); Commonwealth v. Hassey, 40 Mass. App. Ct. 806, 810-811 (1996) (improper for judge to comment on witness credibility where jury are fact finder). To the extent that the statements reflect a hint of irritation, this does not constitute judicial bias. See Cooper v. Keto, 83 Mass. App. Ct. 798, 810 (2013) (transcript merely showed "busy trial judge obviously frustrated by the father's counsel's obstructionist tactics").

 Order affirmed.

FOOTNOTES
[Note 1] Daniel and Erik. The children's names are pseudonyms. 

[Note 2] The father also has two older children, now adults, from a previous marriage. 

[Note 3] The father testified that he called Daniel's pediatrician the next day, when bruises first appeared around Daniel's eyes. A DCF response worker reported, after speaking to the children's nurse care coordinator, that the father called the pediatrician two days later. The nurse care coordinator, however, testified that the father first contacted the pediatrician's office three days later. 

[Note 4] The father testified that the pediatrician told him it was not necessary to bring Daniel in to be seen. Whether or not Daniel needed to be seen on this occasion is not particularly important; what is important is that the parents lack the ability to bring Daniel in for urgent medical care when needed. 

[Note 5] The parents and children report that "[t]he delay resulted from efforts to appoint counsel for the father, to find a Fuzhou interpreter for the mother, and the additional complication of one of the children's lawyers [falling] seriously ill." 

[Note 6] Contrary to the argument of the parents and children, there is no basis for reviewing unpreserved errors in a care and protection case for a substantial risk of a miscarriage of justice. That standard is reserved for criminal cases, see, e.g., Commonwealth v. Santana, 489 Mass. 211, 218 (2022), "quasi criminal" cases, R.B., petitioner, 479 Mass. 712, 716 (2018) (sexually dangerous person commitment), and possibly other involuntary custody cases. See Matter of Laura L., 54 Mass. App. Ct. 853, 854 (2002). We have never applied it to a care and protection case in any published opinion. 

[Note 7] There was contrary evidence provided as well, but the judge could decide which evidence to credit. See Adoption of Bea, 97 Mass. App. Ct. at 429. 

[Note 8] The father engaged in a hunger strike of at least twenty-six days during the proceedings and announced his hunger strike at the outset of a virtual visit with the children. Doretta had earlier engaged in a hunger strike while in DCF custody. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.