## ADOPTION OF IRENE.[1]

No. 01-P-854.

Suffolk. January 9, 2002. - May 1, 2002.

Present: SMITH, CYPHER, & COWIN, JJ.

*Parent and Child,* Adoption, Custody. *Adoption,* Foster parents. *Evidence,* Child custody proceeding. *Practice, Civil,* Findings by judge.

There was no basis for the judge in a child custody proceeding to attribute to the Department of Social Services any ulterior motives or to draw negative inferences from the department's preference for adoption by the child's foster parents, and those inferences weighed heavily, and inappropriately, in his ultimate determination that custody be given to the child's maternal grandmother. [617-620]

In a child custody proceeding, a Juvenile Court judge, who concluded that it was in the child's best interests that she be adopted by her grandmother, erred in excluding reports filed and substantiated pursuant to G. L. c. 119, §§ 51A and 51B, that were relevant to the grandmother's fitness, and in failing to comply with the requirement of G. L. c. 119, § 26(2)(i), that a homestudy of the potential custodian be conducted. [620-621]

A Juvenile Court judge abused his discretion in concluding that it was in a child's best interests that she be transferred from an existing successful placement with her foster parents to an at best uncertain placement with her grandmother, particularly in light of the trauma which, according to the evidence, would likely accompany the change. [621-623]

This court concluded that it was clear from the record in a child custody proceeding that a recommendation of the Department of Social Services that the child's present foster parents were appropriate to care for, and ultimately adopt, her, should have been approved because that recommendation was in the child's best interests; consequently, the court vacated so much of a Juvenile Court decree that ordered implementation of a plan for adoption by the child's grandmother and ordered entry of a decree approving the department's plan of adoption. [623]

PETITION filed in the Boston Division of the Juvenile Court Department on December 7, 1998.

The case was heard by *Leslie E. Harris,* J.

---

[1] A pseudonym.

*Kari Kipf Horstmann* for Department of Social Services.

*Jacqueline Y. Parker* for the child.

*James P. Harrington* for the grandmother.

Cowin, J. A judge of the Boston Juvenile Court determined that the parents of Irene were unfit to parent their child and that their unfitness was likely to continue into the indefinite future to a near certitude. Consequently, he ordered the termination of parental rights pursuant to G. L. c. 119, § 26(4), and c. 210, § 3(*c*). Neither parent appealed. Subsequently, the judge ordered that Irene be removed from the foster home in which she had resided from age five months to age two years and that custody be given to the child's maternal grandmother. The judge also concluded that it was in Irene's best interests that she be adopted by her grandmother, rather than by her foster parents.

Both the Department of Social Services (department) and the child appealed. The order of the Juvenile Court was stayed by a single justice of this court. The department asserts that the judge abused his discretion in ordering the placement in question; committed other errors of law; made unwarranted subsidiary findings; and arrived at an ultimate disposition which was inconsistent with other subsidiary findings that were supported by the evidence. The child also contends that the judge abused his discretion by making a custody determination that was not in her best interests, adding that she had a constitutional right to be adopted by the foster parents and another constitutional right to have certain information pertaining to her maternal grandmother introduced in evidence and considered by the factfinder. The mother participated in the appeal seeking affirmance of the custody determination in favor of the grandmother.

We conclude that certain of the subsidiary findings were not warranted by the evidence and that the G. L. c. 119, § 51A, reports regarding the grandmother, her then live-in boyfriend, and the grandmother's parents, and the G. L. c. 119, § 51B, reports substantiating those § 51A reports, should have been admitted. However, even were we to accept all of the judge's comprehensive findings, and even absent the § 51A and § 51B reports in question, we hold that it was arbitrary, and, thus, an error of law, for the judge to determine that Irene's best interests

will be served by a grant of custody to the grandmother. See *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). Therefore, we need not reach the constitutional questions. For the reasons which we state, we reverse so much of the decree as deals with the plan for adoption by the maternal grandmother and order the entry of a decree approving the department's plan that Irene be adopted by her foster parents.

1. *Material facts.* We set forth the material facts, which we draw from those findings of the trial judge that are not clearly erroneous. See *Adoption of Quentin*, 424 Mass. 882, 886 (1997). We refer to other findings as appropriate elsewhere in the opinion.

Irene was born on August 19, 1998, of a Portuguese mother who identified a man of Cape Verdean descent as the father. The mother had come to the United States with her mother, Irene's grandmother, when she was five. Allegations of physical abuse of the mother and her brother by their mother (grandmother) and her then live-in boyfriend were investigated by the department,[2] but the children were not removed from the home. In January, 1990, the grandmother was deported to Portugal. In October, 1991, the mother, then ten years old, was adjudicated in need of care and protection and placed in the department's permanent custody.

During the first five months of Irene's life, the mother, seventeen when Irene was born, demonstrated beyond any doubt that she was then incapable of parenting her child.[3] Temporary custody of Irene was given to the department on February 3, 1999. The department placed her with her present foster parents. By that time, the foster mother had more than ten years' experience as a foster parent. She had five biological children (three of them then over eighteen) and two adopted children. Two of her biological sons (ages fifteen and thirteen) and the two

---

[2] As noted, the investigation generated reports of abuse and neglect under G. L. c. 119, § 51A, which the department substantiated under G. L. c. 119, § 51B. The judge refused to receive the reports in evidence. See *infra* at 620.

[3] By May, 1999, the father's whereabouts were unknown to the department. He has not participated in these proceedings and is not a parental alternative for Irene.

adopted sons (ages seven and six) continued to live with her and her husband. Neither foster parent is of Portuguese or Cape Verdean descent.

Irene was diagnosed as having low skills in both gross and fine motor ability. She fell frequently, and by February, 2000, was having noticeable difficulty in walking. She was described as having "tactile defensiveness." Her language skills were limited. The foster mother complied with all requirements and recommendations regarding Irene's disabilities, including working with her at least three formal times daily with respect to all of the disabilities and integrating therapeutic procedures throughout the day. By April, 2000, the child, with the help of the foster mother and early intervention services, was making significant progress in overcoming her developmental delays.

On February 20, 2000, the maternal grandmother returned to the United States after a ten-year absence and became a legal resident. She requested that the department consider her as a caretaker for Irene.[4] Her plan was to live with a cousin who was at home full time and who could care for Irene while the grandmother worked. The grandmother had some training and experience in Portugal with respect to children with developmental delays. She "believed that [Irene] would eventually bond with her and her biological family."

Interest in Irene was also expressed by the mother's aunt,[5] who lived in Connecticut with her partner and their five children.[6] The aunt and her partner are Cape Verdeans. The aunt had had a single visit with Irene when the child was less than one month old. She and her partner satisfied the child care requirements of the State of Connecticut. She was not aware of Irene's developmental delays or the reasons for the child's removal from the mother.

The department recommended that Irene be adopted by the

[4]While not the subject of findings by the judge, there was evidence that the grandmother had never met Irene, hardly surprising in light of her extended sojourn in Portugal, and that she was not familiar with the child's special needs.

[5]It is not clear from the record whether the relative was the mother's aunt or cousin. As the trial judge did, we refer to the relative as an "aunt."

[6]The aunt and her partner are unmarried, but lived together from 1975 to 1988, and from 1995 to the time of trial in 2000.

foster parents. The judge approved the department's goal of adoption, but rejected the proposal that the foster parents be selected. Rather, he concluded that it was in Irene's best interests that she be placed with the grandmother and that she ultimately be adopted by her. He found that the department had at all times intended to keep the child with the foster parents "despite the availability of family members, especially [the grandmother], who were able to care for [Irene]." He chose the grandmother instead of the aunt because the former lives in Massachusetts, where Irene has service care providers, and because she is a closer relative.

2. *Applicable standards.* The driving factor in cases of this nature is that the determination regarding custody must be based on the best interests of the subject child. See *Adoption of Hugo*, 428 Mass. 219, 225 (1998). Where the objective is a child's best interests, factual determinations are necessarily involved. The trial judge is ordinarily in the best position to consider and choose among the conflicting elements, and we do not disturb his findings unless they are clearly erroneous. *Id.* at 224-225. However, where alternative plans for adoption are presented, there must be an " 'even-handed' assessment of all the facts," *id.* at 226 n.8, and the judge must give appropriate weight to "the personal, educational, psychological, and other support available to each prospective parent to address [the child's] needs." *Id.* at 227. A plan proposed by a parent is not entitled to any artificial weight as opposed to alternative plans. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 262-267 (1978); *Adoption of Hugo*, supra at 226; *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 62, 69 (1986). Other agendas or influences, to the extent that they do not bear on the child's best interests, have no place in the calculus.

3. *Findings regarding the department.* The findings, certain directives to the department, and statements during the trial made it clear that the judge preferred that Irene be adopted by a family member. While that may be desirable if other considerations are satisfied, our statutes do not create an absolute priority for biological relatives. See *Adoption of a Minor (No. 2)*,

367 Mass. 684, 686-687 (1975). It was the department's judgment that Irene would fare better with her foster family, and the department so recommended.

In weighing the alternative adoption plans, the judge was strongly influenced by his perception that the department had obstructed the efforts of family members and instead placed its finger on the scale in favor of the foster parents. Thus, immediately after his finding that Irene's best interests would be served by a placement with her grandmother, the judge stated that "the [d]epartment did not make any effort to work with the maternal grandmother so that [Irene] could be transitioned to her care." He then attacked the department for intending to maintain Irene with the foster parents, despite the availability of family members, and for refusing to work with the grandmother to bring about a placement of the child with her.

The evidence does not justify the judge's findings that the department purposefully manipulated the situation so as to defeat the legitimate objectives of the family members. With respect to the mother's aunt in Connecticut, the department obtained a favorable homestudy. An adoption worker then tried to reach the aunt by telephone, was unsuccessful, then wrote to her twice to schedule a meeting. The aunt responded to the second letter and scheduled an appointment for April 21, 2000, in Boston.[7] She subsequently canceled the appointment. When the adoption worker telephoned her to attempt to reschedule the meeting, she refused to talk to her. When contact was eventually made, the aunt requested that the meeting be on a Saturday (the adoption worker had offered any time during normal work days); that the meeting be by telephone; and/or that the meeting be scheduled on a day when she could also visit Irene. The judge criticized the department's refusal to accommodate those requests. The refusals were reasonable. The department was justified in demanding that its representative meet with the aunt before the child was to meet with her; that such meeting be in person; and that it take place during normal working hours.

---

[7]The findings disclose irritation on the part of the judge with the fact that the department wrote to the aunt in English and Spanish, rather than in her native language of Portuguese. It is clear, however, that the aunt understood the communications.

Indeed, the reluctance of the aunt to comply with these requests reflects unfavorably on her commitment to the child. The judge was not justified in drawing from these facts adverse inferences regarding the department's purposes or motivations.

Likewise, the finding that the department deliberately refused to work with the grandmother is not warranted. The judge emphasized the fact that the department first sent to her an incomplete homestudy application and then sent a second application with a one-sentence letter. The significance of these communications is unclear given that both were returned marked unclaimed. The grandmother admitted that she never gave the department an updated address and that she refused to speak to the social worker. She never submitted a completed homestudy application. While we recognize the need for some sensitivity and imagination in dealing with circumstances of this kind, those who apply to be caretakers have obligations as well, and their failure to fulfill them has a bearing on their fitness as custodians. The evidence does not support a finding that the department treated the grandmother improperly.

In arriving at his conclusions regarding the department's performance, the judge placed weight on an unannounced visit on December 17, 1999, by a department social worker to a home where the mother was temporarily living. The judge labeled the visit "unprofessional and deceptive." We fail to understand why this was so. The mother at that time had yet to have her parental rights with respect to Irene terminated, and still sought to regain custody of her. The mother was then living with a former teacher, and the social worker visited unannounced to observe whether the living arrangements were adequate. A fair test would have been unlikely had the mother known in advance of its occurrence. Given the mother's history, it was hardly unreasonable of the department to proceed in this fashion.

"A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364,

395 (1948). Here, the evidence showed only that the department followed its normal procedures under difficult circumstances. There was no basis for attributing to the department any ulterior motives, and no negative inferences should have been drawn merely from the fact that, given the information available, the department preferred adoption by the foster parents. The judge nevertheless did draw negative inferences, and those inferences weighed heavily, and inappropriately, in his ultimate determination.

4. *Other evidentiary considerations.* The department asserts that the judge erred by failing to take into account certain evidence which had a bearing on the grandmother's fitness to have custody of Irene. We agree with the department in two respects. First, the judge erroneously excluded the reports filed and substantiated pursuant to G. L. c. 119, §§ 51A and 51B, that were offered in evidence by the department.[8] What was at issue were three reports of abuse and neglect filed in 1989 and 1990, one regarding the grandmother's treatment of her own children (including the mother) and two regarding the treatment of those children by the grandmother's parents with whom they had been left when the grandmother was deported to Portugal. Given the grandmother's recent return to this country, her behavior at the time of her prior residence here, as set forth in these documents, was relevant to a consideration of the grandmother's fitness to have custody of Irene. That two of the reports were not about her abuse or neglect, but instead were about the abuse and neglect of those to whom she entrusted her own children, does not diminish their relevance to the question of her own fitness.

Second, in awarding custody of Irene to the grandmother, the judge did not comply with the requirement of G. L. c. 119, § 26(2)(i), that a homestudy of the potential custodian be conducted. This section provides that "[the court] may . . . transfer temporary legal custody to any of the following: (i) any

---

[8]The 51A reports were admissible to explain how the department became involved with the family, see *Custody of Michel*, 28 Mass. App. Ct. 260, 267 (1990); *Care and Protection of Inga*, 36 Mass. App. Ct. 660, 664 (1994), and the 51B reports were admissible as official records and, thus, could have been considered for statements of fact. See *Custody of Michel, supra.*

individual who, after study by a probation officer or other person or agency designated by the court, is found by the court to be qualified to give care to the child." Here, the judge dispensed with that requirement. He did so, apparently, on the basis of his finding that the department had obstructed the effort to undertake the study, a finding which we have determined was unsupported by the evidence. But even had that finding been warranted, it would not have excused the lack of compliance with the statute. The judge was empowered to take steps to bring about completion of the study. The failure to do so was not harmless. A completed homestudy would presumably have been of assistance given the uncertainty of the grandmother's credentials as a caretaker.

5. *The custody determination.* Other subsidiary findings are also not free from doubt with respect to their support in the evidence. Although the judge referred both to Irene's developmental delays as well as to her mobility difficulties, he failed to acknowledge significant, unrebutted evidence of the child's psychological fragility that manifested itself in what one experienced witness testified was the worst case of "separation anxiety disorder" she had observed out of thousands of cases. The judge's finding that the grandmother had training and experience with developmentally delayed children in Portugal was belied by her own testimony that she had never worked with such children. In addition, the judge did not remark on the fact that the grandmother had never met Irene and was unacquainted with her special needs.[9]

Be that as it may, even if we credit all of the subsidiary findings and ignore the omissions, the portrait of Irene and the applicant caretakers that emerges compels the conclusion that transfer of custody to the grandmother is not in the child's best interests and, thus, constitutes an abuse of discretion. See *Adoption of Hugo*, 428 Mass. at 225; *Adoption of Inez*, 428 Mass. 717, 720 (1999). Irene lived with the foster family from age five months to the time of trial, by which time she was two

---

[9]The grandmother testified that she believed that she and the child would bond *because* they were biologically related. The judge softened this assumption by finding merely that the grandmother believed "that [Irene] would eventually bond with her and her biological family."

years old.[10] This is the only family of which she is conscious. Of greater importance is the fact that the foster family have been successful caretakers, knowledgeable with respect to the child's disabilities and accustomed to dealing with them effectively. The judge's own findings indicate that this placement has been a success story in a world in which failure is frequent.

In contrast, the grandmother does not know Irene; is unfamiliar with her disabilities; has a questionable history with respect to the raising of her own children; may or may not have some familiarity with developmentally delayed children; and plans on leaving Irene during the daytime with another caretaker about whose credentials we know nothing. Furthermore, the mother's continued participation in this case, notwithstanding the final termination of her parental rights, suggests that she will continue to be involved in the child's life, and that the grandmother may turn out to be a nominal custodian with the real force in Irene's life being a woman already adjudicated as unfit. On the face of it, it was arbitrary to decide under these circumstances that Irene should be transferred from the existing successful placement to the at best uncertain placement that the grandmother would provide, particularly in light of the trauma which, according to the evidence, would likely accompany the change.

The judge rejected the department's contention that Irene had bonded with her foster parents and that she would be harmed by a transfer to her grandmother, asserting that there was no evidence supporting such assumptions. The judge was mistaken. There was considerable evidence that such a move would be difficult and would "greatly compromise" the child's ability to cope with her developmental delays. There was also evidence of Irene's attachment to her foster family.

The disposition in the trial court appears to have come about at least in part because of the weight given to two factors: (1) the desire to grant custody of Irene to a biological family member; and (2) the perception that the department had subverted that objective. A biological and/or a cultural match

---

[10]Because of the order of the single justice of this court, she is now approaching her fourth birthday in the custody of the foster family.

between child and caretaker is a desirable aim; but it is a single factor among many. It cannot be permitted to generate a placement decision that is not otherwise in the child's best interests. Even were there support for the findings that the department deliberately attempted to thwart the applications of the child's relatives, which there was not, frustration with the department does not justify an inappropriate placement. Compare *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. at 268-269; *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 586 (1981); *Adoption of Nicole*, 40 Mass. App. Ct. 259, 263 (1996). The judge had the ability to deal with such situations without penalizing the child.

6. *Disposition.* Nothing will be gained by a remand. The record is clear that the department's recommendation of the present foster parents as appropriate to care for, and ultimately to adopt, Irene should have been approved because that recommendation was in the child's best interests. So much of the decree as orders implementation of the plan for adoption by the grandmother is vacated. A decree approving the department's plan of adoption shall enter.

*So ordered.*