NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-780                                        Appeals Court

ADOPTION OF ZAK (and two companion cases[1]).


No. 13-P-780.

Norfolk.     December 10, 2014. - June 19, 2015.

Present:  Katzmann, Hanlon, & Maldonado, JJ.


Adoption, Parent's consent, Dispensing with parent's consent,
     Visitation rights.  Parent and Child, Adoption, Dispensing
     with parent's consent to adoption.  Minor, Adoption,
     Visitation rights.  Practice, Civil, Adoption.




     Petitions filed in the Norfolk County Division of the
Juvenile Court Department on May 19, 2010, and September 9,
2011.

     The cases were heard by Dana Gershengorn, J.


     Sherrie Krasner for the father.
     Deborah Sirotkin Butler for the mother.
     Kari B. Kipf-Horstmann, Assistant Attorney General, for
Department of Children and Families.
     Ann Belmelli O'Connor for Zak.
     Yvette L. Kruger for Carol & another.

---

     [1] Adoption of Carol and Adoption of Nick.  The children's
names are pseudonyms.

MALDONADO, J.  The mother and father separately appeal from Juvenile Court decrees terminating their parental rights.  In addition, the judge ordered posttermination and postadoption visitation for both parents.[2]  The father and mother contend that the termination of their parental rights lacked evidentiary support.  They also argue that the judge erred in denying placement of the children either with the mother's aunt or father's mother.  Finally, the mother, but not the father, challenges the terms of posttermination and postadoption visitation.  She asserts that the children's best interests favors more than the three yearly visits the judge ordered.

Carol and Nick cross-appeal.  They contest the judge's orders for posttermination and postadoption visitation, arguing that there should be no postadoption visitation, and assert that the judge erred in failing to consider the effect on the children of domestic violence as it relates to those visits.

Having in mind the trial judge's careful and thorough findings of fact and rulings of law, we conclude that the judge did not abuse her discretion in terminating the mother and father's parental rights, or in refusing to place the children

---

[2] The mother is the biological parent of the three children. The father is the biological father of Carol and Nick.  Zak's biological father is unknown.  The judge terminated Zak's unknown father's parental rights.  The judge did not order visitation with Zak's stepfather.

either with their maternal great-aunt or paternal grandmother; we therefore affirm those portions of the decrees.  However, we vacate the posttermination and postadoption visitation orders and remand for further consideration and specific findings regarding whether posttermination and postadoption visitation is in the children's best interests, given the domestic violence that they have witnessed.

1.  <u>Termination of parental rights</u>.  The mother and father assert that the termination of their parental rights was based upon a single 2006 incident of domestic violence.[3]  They contend that, aside from this single violent attack, the record supports only a pattern of loud arguing and no other violence.  They note that they present with no other serious shortcomings, such as a history of incarceration, mental illness, or substance abuse; therefore, they complain, the termination of their parental rights lacks record support.  We disagree.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of the evidence, that the parent is unfit to care for the child and that termination is in the

---

[3] In 2006, the father was taken from the home and arrested for assault and battery on the mother.  This incident occurred in the presence of Zak and Carol.

child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Unless shown to be clearly erroneous, we do not disturb the judge's findings, which are entitled to substantial deference." Id. at 606-607.

Here, contrary to the mother's and father's assertions, the judge found, and the record supports, significantly more incidents of domestic violence and harm to the children than the single 2006 incident that the mother and father admit occurred.[4,5] For example, in January, 2008, police responded to the mother and father's apartment after receiving a call for an early morning incident of domestic disturbance. Upon arrival, the police heard a woman screaming, "He is hitting me." Two hours later, police returned to the home after the father called them again; they found the apartment in disarray. Police were again called to the home on August 3 and August 8 of that year for reports of domestic disturbances. The police reported to the residence at approximately 3:00 A.M. on August 8. The

---

[4] At trial, counsel for the parents argued that it was improper to admit certain records produced by the Department of Children and Families (department), including police reports and court interview records; the judge allowed their motions in part and denied them in part. On appeal, neither the mother nor the father challenges the judge's findings on the ground that they rely on excluded or excludable evidence.

[5] We do not list here all incidents of domestic violence that the judge credited, but merely a sampling of the evidence that rebuts the parents' claims of error.

father said the mother was "out of control" and had run out of the apartment naked.  Police found that a glass had been smashed against a wall and broken glass remained shattered on the apartment floor.  Zak and Carol were in the home at that time.

On February 17, 2010, at about 2 A.M., police were called again to the mother and father's apartment for a domestic disturbance.  When a downstairs neighbor spoke to the police, he reported that it sounded like the male in the apartment was "beating" the female. The father was arrested for assault and battery,[6] and, as he was being removed from the apartment, he admonished the mother, "Tell them I didn't hit you."  The mother was found in a closet with a shirt over her head.  She told the police that the father had pushed her; she had bruises on her person.  Again, Carol and Zak were present during the incident.  Roughly two hours later, police were called again to the apartment.  The mother, Carol, and Zak met the police outside the apartment.  The mother claimed that the father had kicked them out of the apartment, and "physically pushed [Zak] out of the apartment."  The father was then arrested for assault and battery.

In November, 2011, the mother requested and obtained a G. L. c. 209A abuse prevention order against the father.  In the affidavit supporting the order, the mother affirmed that she

---

[6] He ultimately was not convicted.

"was scared for [her] life." In February of 2012, the mother asked to have the order vacated; however, in March, 2012, one month later and only two months before trial, she obtained a second c. 209A order. At that time, the mother stated that she did not "feel safe." Over time, the mother has gone to domestic violence shelters with the children and has fled with the children to her aunt's house late in the evening. The trial judge did not credit either the mother's or father's minimization of these incidents.

The judge also found the children had been the subject of physical violence. Zak testified that both parents had beaten him with a belt. Zak also testified that, on one occasion, the father struck him, causing him to fall back and hit a bedframe. Zak testified that he was scared when his parents argued, and he stated that he was "done with the fighting." Carol stated to a court investigator that she feels "sad and scared" when her parents argue and fight, and that the scariest fighting is when "they push and fight." Both children have been diagnosed with posttraumatic stress disorder.

On this record, we see no error in the judge's finding of a pattern of violence and verbally abusive behavior that affected the children adversely. See, e.g., Care & Protection of Lillith, 61 Mass. App. Ct. 132, 137-142 (2004). "It is well documented that witnessing domestic violence, as well as being

one of its victims, has a profound impact on children." Custody
of Vaughn, 422 Mass. 590, 599 (1996).  "[A] child who has been
either the victim or the spectator of such abuse suffers a
distinctly grievous kind of harm."  Id. at 595.  See Loebel v.
Loebel, 77 Mass. App. Ct. 740, 748 (2010).[7]

Moreover, the harm that domestic violence and unrest caused
the children was not the only factor rendering the mother and
father unfit.  The judge found that "[b]oth parents have failed
to consistently participate or engage in services" "offered
. . . by the Department [of Children and Families
(department)]," and that "the parents' behaviors have not
changed" from the services they did receive.  See, e.g.,
Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005) ("refusal
to cooperate with the department . . . is relevant to the
determination of unfitness").  For instance, after attending a
batterer's program, the father claimed to have learned that he

---

[7] "The effects of abuse on the child include, but are not
limited to, 'the child is afraid of the abusive parent; the
child is having problems with his or her performance at school;
the child has exhibited regressive behavior; the child has
problems with peer or family relationships; the child has been
experiencing nightmares and sleep disturbances; the child has
frightening memories from witnessing the abuse, the child
exhibited extreme distress at the time of the incident from
witnessing the abuse; or, the child has exhibited hostile or
aggressive behavior toward others.'  Commentary to § 12:05A of
the Guidelines for Judicial Practice:  Abuse Prevention
Proceedings (2014)."  K.A. v. T.R., 86 Mass. App. Ct. 554, 560
n.12 (2014).

"is not a batterer."  The father "has not benefitted in any significant way from therapy"; his "work with [his therapist] on Father's issues of power and control is not complete," nor is his "work with [his therapist] on conflict resolution between Father and Mother."  The mother, in her own words, did not "follow up with [individual] counseling."  By the time of trial, the mother was not partaking in domestic violence services, nor was she attempting to engage in those services.  The judge also found that "the Mother was lying to the [department's] workers about her contact with, and relationship with," the father, and that she "was being dishonest with her therapist."

In addition, the parents demonstrated other concerning behaviors during visits with their children while the children were in foster care.  Both the father and mother failed to appear at visits or showed up late to visits, which resulted in those visits being cancelled after the children had already arrived at the visitation center.  The mother and father also left visits early.  During one visit in 2010, after Carol urinated on herself, the mother took her to a restroom, pulled down her pants, and stated she observed black marks in her vaginal area, prompting the agency to call the police because the mother believed Carol was being sexually abused.  The subsequent doctor's examination showed no signs of abuse. During another visit in 2012, while holding Nick, the father

said, "Let me see your penis, I haven't seen you in a long time," and looked down his pants. During yet another 2012 visit, the father allegedly struck or tapped Nick on the face for refusing to take water, which resulted in the department filing a G. L. c. 119, § 51A, report against the father. The judge's subsidiary findings of fact amply support her decision to find the parents unfit and to terminate their parental rights.

2. Placement of the children with family members. The mother contends that the children's best interests favors placement with her aunt -- the children's biological great-aunt. The father argues for family placement with either his mother (their biological grandmother) or their maternal great-aunt.

We review the judge's placement determination for abuse of discretion. See Adoption of Hugo, 428 Mass. 219, 225-226 (1998). "A biological and/or a cultural match between child and caretaker is a desirable aim; but it is a single factor among many. It cannot be permitted to generate a placement decision that is not otherwise in the child's best interests." Adoption of Irene, 54 Mass. App. Ct. 613, 622-623 (2002). Here, the judge explicitly credited the testimony of Zak that the mother's aunt "struck the children." Moreover, based on the aunt's "passivity in the face of overwhelming information about the violence in the parents' relationship," including her failure to

acknowledge the existence of domestic violence between the mother and father, the judge reasonably found that the aunt was incapable of shielding the children from the mother and father's violence. We agree with the judge's conclusion that the "children need and deserve a placement free of all violence." Accordingly, we see no abuse of discretion in denying placement to maternal great-aunt despite her familial and cultural connections to the children.[8,9] See id. at 622 ("the grandmother

---

[8] The mother also contends that "were [the mother's aunt] and the mother not women of color, [the mother's] three children would have been placed with [the aunt]." The mother cites no evidentiary support for this argument, and therefore it does not rise to the level of appellate argument. See Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); Adams v. Adams, 459 Mass. 361, 392 (2011).

[9] The mother also contends that the children, at the time of the judge's decision, were at risk of becoming "legal orphans" if the mother's rights were terminated and the children were not placed with family members, because no other adoptive home had yet to be identified at the time of trial. The judge did not abuse her discretion on this basis. "Although a factor, the absence of imminent adoption prospects does not, by itself, invalidate a decision to terminate parental rights." Adoption of Jacques, 82 Mass. App. Ct. 601, 610 (2012). The judge did not abuse her discretion, as the judge found that the children's needs for "permanence and stability" would not be met by familial placements. Id. See Adoption of Nancy, 443 Mass. 512, 516-518 & n.7 (2005).

Counsel for the department and for the children also represented at oral argument and in a letter submitted after argument that this issue was moot because all the children have been placed together in a preadoptive home that is a cultural match. Counsel for the mother moved to strike these statements as they are outside the record, and asked us to consider only that evidence before the judge at the time her decision was made. We do not consider this information, but nevertheless are

may turn out to be a nominal custodian with the real force in Irene's life being" her mother).

The judge likewise did not abuse her discretion in deciding against placement with paternal grandmother. Id. at 622. The father's mother testified, and the judge found, that "she has never set boundaries in the past with Father," and, significantly, that she "is unable or unwilling to accept that Father has engaged in a violent relationship with Mother. . . ." As the judge reasoned, this record engenders "no faith that [the] paternal grandmother would be able or willing to adequately safeguard the children from the parents' violent relationship."

3. Visitation. The mother asserts the judge erred in ordering only a minimal three visits per year. Conversely, Carol and Nick argue that the children's exposure to the mother and the father's violent relationship militates against an order for posttermination visits. Relying on Custody of Vaughn, 422 Mass. 590 (1996), the children contend that the judge erred in failing to make specific findings regarding the impact of domestic violence on the appropriateness of posttermination visitation. We agree.

---

satisfied, under all of the circumstances of this case, that the judge committed no abuse of discretion in declining to place the children with family, even when there was no other preadoptive home identified at that time.

Here, the judge made explicit findings that the children had been exposed to a pattern of domestic violence that had affected them adversely, devoting an entire section in her memorandum to that topic. However, when ordering posttermination visits, she made no mention of the history of domestic violence in the family, its impact on the children, or whether, notwithstanding that history, it was in the best interests of these children to have postadoption visitation with their biological parents. "Domestic violence is an issue too fundamental and frequently recurring to be dealt with only by implication." Vaughn, supra at 599. See Maalouf v. Saliba, 54 Mass. App. Ct. 547, 551 (2002), where we reversed an order of the Probate and Family Court on the ground that the record was "unclear whether [the judge] considered the safety and well-being of the children in granting . . . visitation" to a father who had "resorted to physical violence on four occasions . . . . [The judge also had] concluded that the mother had suffered abuse at the hands of the father." That case addressed specifically the requirements of G. L. c. 208, § 31A, which does not, on its face, apply to this termination of parental rights case. Nonetheless, we conclude that its reasoning provides a useful and important framework for considering posttermination, postadoption visitation orders as well.

Accordingly, we vacate the order for posttermination visits and remand the matter to the trial judge for consideration and findings whether, in light of the history of domestic violence witnessed by the children, in addition to all other relevant factors, posttermination and postadoption visits are in the children's best interests.[10]  See <u>Adoption of Helen</u>, 429 Mass. 856, 863 (1999) ("While posttermination visitation may be allowed, the proper focus is on the best interests of the child").

<u>So ordered</u>.

---

[10] We note that, on remand, the judge is not prevented from considering changed circumstances since the date of the original issuance of the decree, such as whether the children have been placed in a preadoptive home.  <u>Adoption of Vito</u>, 431 Mass. 550, 557 n.15 (2000) ("a judge . . . . may revisit the question of postadoption contact, if necessary, for the best interests of the child due to changed circumstances.").  See <u>Adoption of Gwendolyn</u>, 29 Mass. App. Ct. 130, 139 (judge properly left matter of visitation in hands of adoptive parents).