NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-240

ADOPTION OF CAMILLA
(and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from decrees entered after trial in the Probate and Family Court terminating her parental rights.[2] At trial, the mother stipulated that she was unfit but contends that the judge erred because termination of her parental rights was not in the children's best interests. She also argues that the judge failed to ascertain or give sufficient weight to the children's wishes, and that the judge abused his discretion in limiting posttermination and postadoption visitation. We affirm.

1. Background. Camilla was born in 2009 and Ben[3] was born in 2007. The Department of Children and Families (department)

_____

[1] Adoption of Ben. The children's names are pseudonyms.

[2] The father's parental rights were terminated on February 8, 2018. He did not appeal from that decision.

[3] Ben filed a notice of appeal and thereafter resolved his claims. Ben's motion to dismiss his appeal was allowed by this court.

first became involved with the family in December 2010, when it received two reports filed pursuant to G. L. c. 119, § 51A (51A report), alleging that the children witnessed an incident of domestic violence between the mother and father. After an investigation conducted pursuant to G. L. c. 119, § 51B (51B investigation), the department closed the case because the mother had obtained a restraining order pursuant to G. L. c. 209A against the father, and the two were in individual counseling. Subsequently, another 51A report was filed, again alleging domestic violence, and during the 51B investigation, an additional 51A report was filed and screened in, alleging neglect of the children. This time the department opened the case for services.

By February 2013, the children were living with the maternal grandparents pursuant to a caregiver affidavit signed by the mother. Multiple 51A reports were filed during this time alleging neglect and both physical and sexual abuse of Camilla by the maternal grandfather and neglect by the maternal grandmother. The department returned the children to the mother's home.

In September 2013, a 51A report was filed alleging neglect of the children by the mother and the father. The report alleged that the father was a level three sex offender and lived in the mother's home in violation of a court order. The report

also alleged that the father hid, or the mother lied about where the father lived, during department visits to the mother's home. During the 51B investigation, the department learned that Ben was exhibiting problematic behaviors at school, had sporadic attendance, and arrived at school tired and hungry. Ben described fights that he witnessed between his parents including one in which the mother hit the father in the face. In addition, the social worker observed Camilla at her day care and noted that her hair was matted, and that she appeared dirty. Day care staff reported that Camilla arrived tired and hungry. Camilla reported that her parents fought a lot, and that she saw her mother kick her father in the head when the father climbed through a window.

During this time, numerous 51A reports were filed, many of which chronicled instances of domestic violence between the mother and her romantic partners, the mother's substance misuse, and her mental health struggles. Additional 51A reports alleged that the mother was under the influence of something when she met the children from the bus, her new boyfriend used drugs in front of the children, the mother had homeless people living with her, and that someone had overdosed in her home. In addition, 51A reports alleged that the mother forgot to

3

administer Ben's medication, and thereafter, Ben presented at school as overmedicated.[4]

In August 2015, the department received another 51A report, which alleged that the mother's home had been condemned by the board of health and the mother had attempted suicide; this report was supported after the department's investigation. The maternal grandparents obtained temporary guardianship of the children. In January 2016, the department returned the children to the mother, but removed them in February after a department social worker saw the mother buying alcohol at a liquor store. Thereafter, the department filed a care and protection petition pursuant to G. L. c. 119, § 24, and the department was awarded custody of the children. In January 2017, the department filed a petition seeking to terminate the mother's parental rights pursuant to G. L. c. 210, § 3. On December 12, 2017, the mother signed a stipulation agreeing that she was then unfit to parent the children, and that the children should be placed in the department's permanent custody. The department withdrew the petition to terminate the mother's parental rights.

On October 29, 2020, the department filed petitions to dispense with parental consent to adoption of the children

---

[4] Most of the 51A reports were screened in but some were screened out on the basis that the family was already being monitored by the department.

pursuant to G. L. c. 210, § 3.  At trial, the mother again stipulated that she was unfit, and that the children should remain in the permanent custody of the department; she objected, however, to the termination of her parental rights.  After a trial in June 2021, the judge terminated the mother's parental rights and ordered posttermination and postadoption visitation. This appeal followed.

2.  Discussion.  Best interests of the children.  Because the mother stipulated to unfitness, the sole issue at trial was whether the termination of her parental rights was in the children's best interests, and the critical question in that regard was whether the department produced clear and convincing evidence that the mother likely would remain unfit in the future.  See Adoption of Ilona, 459 Mass. 53, 59-60 (2011).  "We give substantial deference to the judge's findings of fact and decision, and will reverse only 'where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'"  Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, supra at 59.

Evidence of the mother's past unfitness (something she stipulated to twice in these proceedings) is relevant to the determination of the children's best interests because a "pattern of parental neglect or misconduct" may be considered "in determining future fitness and the likelihood of harm to the

child[ren]." Adoption of Elena, 446 Mass. 24, 33 (2006). Here, the record is replete with evidence that the mother's relationships were permeated with domestic violence, she struggled with substance misuse, and did not follow through with the recommended treatment.[5] The judge properly considered this evidence in assessing whether termination of the mother's parental rights was in the children's best interests. See Adoption of Katharine, 42 Mass. App. Ct. 25, 32-33 (1997).

The evidence supporting the mother's unfitness included being the victim of and perpetrating domestic violence. See Adoption of Zak, 87 Mass. App. Ct. 540, 543 (2015) ("witnessing domestic violence, as well as being one of its victims, has a profound impact on children" [quotation and citation omitted]). See also Custody of Vaughn, 422 Mass. 590, 595 (1996) ("a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm"). It also included the mother's struggle with substance use disorder,[6] see Adoption of Helen, 429 Mass. 856, 860 (1999) ("unsuccessful attempts to

---

[5] Notably, the mother does not allege that any of the findings of fact are erroneous.

[6] The mother began misusing alcohol and drugs at age thirteen. In August 2012, the mother agreed to seek treatment after two 51A reports were filed. Between 2015 and 2017, the mother relapsed on heroin multiple times. Although she was prescribed Suboxone, the mother began purchasing it "off the street" when the prescription ran out. The mother was asked to leave two different substance misuse treatment facilities for violating the programs' rules.

address . . . substance [mis]use" properly considered in termination proceedings), and her failure to follow through with recommended treatment,[7] see Adoption of Luc, 484 Mass. at 147.

The evidence of the mother's conduct demonstrated that she was either continuing to experience issues or failing to acknowledge and address them. Because the judge is permitted to use "past conduct, medical history, and present events to predict future ability and performance as a parent," Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998), we discern no clear error or abuse of discretion in his determination that the mother's longstanding issues were likely to continue in the future such that termination of her parental rights was in the children's best interests. See Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 136 (1990) ("It is in the best interests of Gwendolyn to have 'parents' who can and who will, on a consistent, longterm basis, assume all parental responsibilities and who can provide Gwendolyn with the stable and continuous care and nurturing she needs and will continue to need as a child"). This is particularly true where the children

_____

[7] Throughout this litigation, the mother struggled to attend substance misuse treatment as required by the department. At trial, the mother testified that she had been sober for five and one-half years, however, a urine test on the second day of trial was positive for numerous substances. The mother admitted that she had used crack cocaine, Klonopin, and heroin in the days prior. Thereafter, the mother did not attend the last day of trial.

each have special needs.[8]  See <u>Adoption of Frederick</u>, 405 Mass. 1, 9 (1989).

The mother's claim that the judge did not ascertain or properly weigh the children's wishes is belied by the record. The judge noted that Camilla is "very connected" to her foster parents and "very bonded" to the mother and did not wish to be adopted.[9]  While a judge should consider the children's wishes, their views are not decisive, nor outcome determinative.  See <u>Adoption of Nancy</u>, 443 Mass. 512, 518 (2005).  To the extent that the mother contends that Camilla should have been called as a witness or that the judge should have spoken to her in chambers, this argument is made for the first time on appeal and is therefore waived.  See <u>White</u> v. <u>White</u>, 40 Mass. App. Ct. 132, 133 (1996).  Moreover, the mother does not have standing to challenge the strategy of Camilla's counsel.  See <u>Adoption of Mary</u>, 414 Mass. 705, 713 (1993).

---

[8] Ben is diagnosed with posttraumatic stress disorder, reactive-attachment disorder, ADHD, major depressive disorder, and generalized anxiety disorder.  He has attempted suicide twice, in 2019 and 2020.  At the time of trial, Ben was living at a residential program for adolescents with complex trauma and behavioral issues, where his behavior has improved greatly. Prior to her current placement, Camilla spent one hundred days in a residential treatment program because she struggled with her significant behavioral and emotional needs.  In her current placement Camilla has improved substantially.

[9] We note that on appeal, Camilla supports the termination of the mother's parental rights and the order of posttermination and postadoption visitation.

Posttermination and postadoption visitation.  "Once it is established that a parent is unfit, the decision whether to grant postadoption [or posttermination] visits must be left to the sound discretion of the trial judge.  The judge's discretion is not, however, unfettered, but must be grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation" (quotations and citations omitted).  Adoption of Terrence, 57 Mass. App. Ct. 832, 839 (2003).  Here, the judge considered the children's bonds with the mother and ordered that the mother have, at a minimum, three visits per year.  We discern no clear error or abuse of discretion in the judge's order.

Decrees affirmed.

By the Court (Blake, Walsh & Hershfang, JJ.[10]),

*Joseph F. Stanton*

Clerk

Entered:  July 14, 2023.

---

[10] The panelists are listed in order of seniority.