NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1056

ADOPTION OF ADRIAN (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The three parents involved in this case appeal from decrees issued by a Juvenile Court judge terminating their parental rights to two children. We conclude that there was adequate evidence of parental unfitness for all three parents, based on all parents' persistent domestic violence, all parents' inconsistent and inappropriate visitation, substance use issues for the mother and one of the fathers, and untreated mental health problems and housing instability for the mother, all of which placed the children at unacceptable risk. Although the conduct of the trial was imperfect, the trial judge neither prejudged the credibility of the witness nor exhibited bias.

---

[1] Adoption of Idra. The children's names are pseudonyms. The children supported the termination of parental rights in the Juvenile Court and continue to do so on appeal.

Finally concluding that the other issues raised in this appeal lack merit, we affirm.

1. Background. a. Domestic violence. The father of Adrian (father 1) and the mother have an "extensive history of physical and verbal domestic violence." Both have been perpetrators and victims. The judge's findings in this regard are well supported by the testimony and records submitted during the trial. The father of Idra (father 2) has a history of domestic violence against the mother, to the point where father 2 was sentenced to eleven months of incarceration for assault and battery on the mother and her friend while the mother was pregnant. Again, the judge's findings in this regard are well-supported by the testimony and records submitted at trial.

All three parents have not adequately participated in domestic violence services, despite the recommendations of the Department of Children and Families (DCF). The mother has inconsistently sought domestic violence counseling. Throughout 2022, despite repeated referrals and recommendations from clinicians and DCF, the mother refused to engage in individual therapy or group trauma-based therapy services. In July 2022, she reported that she was engaging in an out-of-state virtual domestic violence group class, but DCF could not confirm her participation in this program or assess her progress.

Similarly, neither father 1 nor father 2 has meaningfully participated in domestic violence counseling or any intimate partner abuse education programs despite DCF recommendations.

b. <u>Visitation</u>. During visits, the mother "displayed indifference" towards the children, arrived unprepared without "diapers, toys and food," and was often observed "not interacting" with the children. On two occasions, she appeared visibly intoxicated when she visited the children. On several occasions, the mother let Idra wander outside the visiting room unsupervised.

Father 1's visits with Adrian were frequently limited or cut short because of his inappropriate behavior. During one visit, father 1 made "inappropriate, sexual comments" towards a social worker and, at other visits, used vulgar language in front of the child. In July 2020, father 1 threatened the foster parents during a visit. In May 2021, at a supervised visit, father 1 disparaged DCF social workers in front of the child. In February 2022, father 1 recorded a TikTok video of Adrian during a visit in which he stated that Adrian was "imprisoned" in the DCF office. In May 2022, father 1 appeared intoxicated during one of his visits.

In July 2020, father 2 contacted DCF and requested involvement in Idra's case but did not establish paternity until

October 2021.[2]  In March 2021, father 2 received his first action plan from DCF.  Between October 2021 and April 2022, father 2 attended twelve to sixteen visits with the child.  His supervised visits ended, however, in April 2022 when he fled Massachusetts after violating a bail agreement.  Father 2 has not visited the child since April 2022.

    c.  <u>Other issues</u>.  The mother has struggled with housing instability since 2001.  From 2010 to 2019, she lived with father 1.  In 2020, the mother changed residences several times, living with numerous different individuals.  At the conclusion of trial, the mother was living with her aunt and "had yet to obtain stable housing."[3]

The mother has been diagnosed with bipolar disorder, depression, post-traumatic stress disorder (PTSD), and alcohol use disorder.  She has not consistently engaged in individual therapy or a medication regimen despite "numerous recommendations and referrals" from DCF.  The mother has not engaged in any treatment for her bipolar disorder or sought psychiatric treatment in over ten years.  In August 2017, she started therapy but was formally discharged from the program in

---

[2] Father 2 was incarcerated at least some of this time.

[3] By contrast, father 1 obtained a one-bedroom apartment in 2023.

4

2018.  She sought treatment again in March 2020 but participated in treatment so inconsistently that she had to reenroll in the program on several occasions.  At trial, the mother claimed she attends virtual group sessions to treat PTSD but her participation in this program had not been verified.

The mother has a history of using "alcohol, crack cocaine, heroin, and opiate-based prescription medication."  She tested positive for cocaine in 2017, after she gave birth to Adrian, and in 2020, two days before giving birth to Idra.[4]  The mother overdosed on three separate occasions from March 2019 to March 2020, including once when she was pregnant with Idra.  From 2021 to 2023, she tested positive for opiates on several occasions and appeared intoxicated in front of police and DCF workers.  At trial, the mother was unable to explain her recent positive drug tests and seemed not to understand how her substance use contributed to the removal of the children.

Father 1 has been diagnosed with opioid dependency and alcohol dependency.  In February 2017, when the mother was pregnant, father 1 overdosed on heroin.  Father 1 engaged in substance use treatment services in 2017 but stopped in 2018.  On March 3, 2021, father 1 was arrested and charged with possession of narcotics.  At trial, he testified that he did not

---

[4] The mother refused to take a drug test when she gave birth to Idra.

5

believe he had any problems with substance use.  None of the three parents completed the tasks in any of their multiple action plans.

2.  Termination of parental rights.  a.  Standard of review.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  Parental unfitness must be determined by taking into consideration "a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Adoption of Mary, 414 Mass. 705, 711 (1993).

b.  Termination of the mother's parental rights.  The mother's persistent involvement in relationships filled with domestic violence, both as a victim and a perpetrator, is a significant basis for finding her unfit.  See Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021) ("Domestic violence may imperil a child's physical safety and psychological development").  There were numerous incidents where father 1 struck her and incidents where she struck father 1, including

6

one time with a hammer. She falsely stated that the relationship ended in 2019, even though she had been observed kissing and embracing father 1 in 2022. Similarly, she stayed in a relationship with father 2 despite repeated incidents of violence by him. She falsely stated at trial that she was not in contact with father 2.

The mother has failed to address her history of domestic violence. Despite numerous referrals from DCF, the mother failed to participate consistently in domestic violence counseling programs. See Adoption of Zak, 87 Mass. App. Ct. 540, 544 (2015) (parents' lack of engagement with domestic abuse counseling supported finding of unfitness). Similarly, the mother's ongoing contact with both father 1 and father 2 is "probative of her inability to protect herself and her children from future abuse." See Adoption of Jacob, 99 Mass. App. Ct. at 265.

Furthermore, the mother "displayed inappropriate behavior in front of or towards the subject children" during supervised visits. The mother failed to bring diapers or toys for the children, despite numerous reminders, and "displayed an unwillingness to engage with her children." She repeatedly allowed one of the children to wander around unsupervised. The mother's demonstrated failure to care appropriately for the children during visits supported a finding of unfitness. See

7

Adoption of Rhona, 63 Mass. App. Ct. 117, 122 (2005) (finding that mother's lack of engagement with child during visit contributed to lack of bonding).

In addition, the mother's substance misuse would place the children at a significant risk of harm. Although the mother testified that she has been sober since 2013, she has overdosed three times since then, including while pregnant, and tested positive for opiates several times between 2021 and 2023. A history of substance misuse alone is not enough to establish parental unfitness, but a parent's unwillingness to engage in treatment is an important consideration. See Adoption of Elena, 446 Mass. 24, 32-33 (2006). Here, the mother engaged only intermittently in treatment and once appeared intoxicated while visiting the children. Additionally, the mother does not appear to understand that her issues with substance misuse affect her ability to parent. See Adoption of Luc, 484 Mass. 139, 147 (2020) (failing to engage in treatment and not recognizing need for treatment speaks to parental fitness where it "inhibits parent's ability to provide minimally acceptable care").

The mother has persistently struggled with housing instability. She had not had stable housing since 2001 and had not secured her own stable housing by the time of trial. This contributed to her unfitness. See Adoption of Anton, 72 Mass.

8

App. Ct. 667, 676 (2008) (inability to secure adequate and stable housing properly considered in fitness determination).

Finally, untreated mental disorders that affect a parent's ability to care for a child may support a finding of parental unfitness. Adoption of Leonard, 103 Mass. App. Ct. 416, 423 (2023). Here, despite numerous recommendations, the mother has not meaningfully participated in any treatment that would address her mental health needs. The mother has not followed a medicine regimen in over ten years. Additionally, even though the mother has been diagnosed with PTSD in part because of the trauma she has suffered through domestic violence, she did not meaningfully engage in domestic violence support groups or classes. Instead, the mother continued to maintain unhealthy relationships with father 1 and father 2. The judge properly found that the mother's inability to address her mental health needs or distance herself from unhealthy relationships contributed to her unfitness.

c. Termination of father 1's parental rights. As stated, father 1 has an "extensive history of physical and verbal domestic violence" with the mother. Despite this troubling history, he refused to engage in domestic violence counseling. His history of domestic violence is a powerful factor supporting the finding of parental unfitness. See Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017) ("instances of such familial

9

violence are compelling evidence for a finding of parental unfitness").

Father 1 has also failed to engage in substance use treatment. See Adoption of Elena, 446 Mass. at 32-33. Father 1 has not sought treatment since 2018 despite recommendations from DCF. Father 1 visited the child while intoxicated and was arrested for possession of narcotics.

Finally, father 1 frequently behaved inappropriately towards DCF staff and Adrian during his supervised visits by making "inappropriate, sexual comments" towards a social worker during a visit and using vulgar language in front of the child. Father 1 would frequently talk about case matters and would disparage DCF and his social worker. In other visits, father 1 claimed the child was "imprisoned" by DCF and threatened the foster parents. In addition to his behavior towards staff, father 1 refused to engage in any services that DCF recommended. Father 1 did not seek substance use treatment after 2018. Father 1 additionally never meaningfully participated in domestic violence counseling or education programs. The father "was given multiple opportunities over the course of years to demonstrate that [he] could provide [the child] a safe and stable home, and [he] failed to do so." Adoption of Knox, 102

10

Mass. at 94. We discern no error in the judge's weighing of the evidence of father 1's fitness.[5]

4. Judicial conduct. a. Prejudging witness credibility. It is well established that "the finder of fact must keep an open mind until all the evidence is presented and both sides have rested." Adoption of Tia, 73 Mass. App. Ct. 115, 121-122 (2008). If a judge "reaches a decision on an issue of fact before the testimony of that issue is complete . . . [he] has deprived the party of [her] right to a full and fair hearing." Adoption of Georgia, 433 Mass. 62, 64-65 (2000), quoting Preston v. Peck, 271 Mass. 159, 164 (1930).

At trial, both the mother and father 1 were asked about the timeline of their relationship. Although the mother and father 1 each testified that the relationship ended years before, multiple DCF reports and a police report showed that their relationship continued until at least 2022. In one guardian ad litem report, a social worker recounted that the mother and father 1 were kissing on the steps of the courthouse in February 2022. The report was admitted into evidence at the start of trial.

When asked about the report, the mother testified that she did not kiss father 1 in front of the courthouse. The judge

---

[5] Father 2 does not challenge the termination of his parental rights on appeal.

asked the mother, "You're saying that [the social worker is] going to come up here and lie about that?"  The judge stated, "it's hard for me to imagine the social worker, who has no gain in this case whatsoever, is going to come up here and lie under oath."  When the mother stated that the social worker had "lied about many reports," the judge responded, "we'll see if you can prove it."

To be sure, these statements were not proper.  The judge could not determine the likely credibility of the social worker's testimony without hearing it, and a witness should never be asked to opine on the credibility of another witness's testimony.  See Commonwealth v. Quinn, 469 Mass. 641, 646 (2014); Commonwealth v. Sanchez, 96 Mass. App. Ct. 1, 2 (2019); White v. White, 40 Mass. App. Ct. 132, 142 (1996).  Nonetheless, the judge's statements must be read in context of the entire trial.  See Adoption of Georgia, 433 Mass. at 65 (finding that judicial conduct was proper when read in context of whole trial).  The judge already had access to the March 2022 guardian ad litem report.  See Adoption of Larry, 434 Mass. 456, 464 (2001) (judge may consider evidence outside of mother's testimony when determining credibility).  It is evident that the judge's goal was to warn the mother against taking an unconsidered position before it was too late to turn back.

12

The judge's actions later in the trial demonstrated that he did, in fact, keep an open mind.  When DCF's counsel asked father 1 about the same events outside the courthouse, the judge sustained father 1's counsel's objection, stating father 1 "has clearly said he did not embrace or kiss [the mother] and if [the social worker] saw something different, we'll hear from him, and the Court will determine credibility."  Accordingly, despite the judge's inartful words, he kept an open mind about the matter until he heard from all of the witnesses.  In this context, the judge's comments did not "reflect premature conclusions, but rather, preliminary thoughts on witness credibility."  Adoption of Doretta, 101 Mass. App. Ct. 582, 596 (2022).

b.  Judicial bias.  "It is well established that a judge in this Commonwealth may question witnesses to clarify and develop evidence and to avert perjury."  Commonwealth v. Watkins, 63 Mass. App. Ct. 69, 74 (2005).  "A judge may properly participate in the questioning of a witness so long as the questioning is not partisan in nature."  Commonwealth v. Lucien, 440 Mass. 658, 664 (2004).  Generally, "we have not favored except in extenuating circumstances the takeover of questioning by a judge during the course of trial."  Adoption of Norbert, 83 Mass. App. Ct. 542, 547 (2013), quoting Commonwealth v. Campbell, 371 Mass. 40, 45 (1976).

13

Here, DCF was asking the mother about her twin sister's calling the police to report that father 1 had assaulted the mother. The mother reported that her sister "was on drugs" at the time but could not provide the date. She then started testifying about a conversation she had with her sister and identified it as occurring on March 19, 2019. The judge asked the mother how she could remember a conversation from 2019 when she "didn't remember something five minutes ago from six months ago." When the mother confirmed that she "remembered most" of her conversations with her sister, the judge then asked the mother a number of questions seeking details about March 19, 2019.

Although the judge's frustration with the mother's testimony is understandable, this line of questioning strayed from clarification to impeachment. See Adoption of Norbert, 83 Mass. App. Ct. at 546. The mother, however, raised no objection nor asked for the judge's recusal or any lesser corrective action. See Adoption of Flora, 60 Mass. App. Ct. 334, 340 n.10 (2004) ("We recognize that ordinarily issues not raised at trial are not considered on appeal absent special circumstances").[6]

---

[6] Further, as we have previously held, "there is no basis for reviewing unpreserved errors in a care and protection case for a substantial risk of a miscarriage of justice." Adoption of Doretta, 101 Mass. App. Ct. at 592 n.6.

14

Even if this issue had been properly preserved, we discern no prejudice. The judge did not limit the mother's attorney's questioning of witnesses. The mother was not prevented from presenting relevant evidence nor did the judge solicit inadmissible evidence. See Adoption of Norbert, 83 Mass. App. Ct. at 547. The testimony in question was about a minor point. Moreover, the evidence of the mother's unfitness was strong. "Because the record contains ample support for the judge's detailed (and uncontested) findings, which, in turn, unequivocally support the judge's determination that the termination of parental rights serves the best interests of the children, we conclude that the error was harmless." Id. at 548. See Adoption of Tia, 73 Mass. App. Ct. at 124 ("the evidence in this case so substantially supported the judge's findings and conclusion that the mistakes do not warrant reversal").

6. Father 1's other claims.[7] Father 1 argues that the trial court improperly considered hearsay evidence. "Service plans, case reviews and foster care reviews kept as records of [DCF] are admissible, with some limitations, as records of a public agency." Adoption of Vidal, 56 Mass. App. Ct. 916, 916 (2002). These records fall under the hearsay exception that

_____

[7] Father 1, through appellate counsel, raises three additional issues in his reply brief under Commonwealth v. Moffett, 383 Mass. 201, 208 (1981), and Care & Protection of Valerie, 403 Mass. 317, 318 (1988).

15

authorizes "admission [of] statements of primary fact, so long as the hearsay source is specifically identified in the report and is available for cross-examination, should the party challenging the evidence request to do so." Adoption of Luc, 484 Mass. at 154. This rule also applies to police reports even if no charges were brought or convictions secured. See Care & Protection of Frank, 409 Mass. 492, 494, 497 (1991) (police report properly admitted even though criminal charge were dismissed).

Father 1 also raises the issue of ineffective assistance of counsel. Trial counsel is ineffective if "the 'behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer,'" and "'[counsel's conduct] has likely deprived the defendant of an otherwise available substantial ground of defence.'" Care & Protection of Georgette, 439 Mass. 28, 33 (2003), quoting Commonwealth v. Safarian, 366 Mass. 89, 96 (1974). "Absent exceptional circumstances, we do not review claims of ineffective assistance of counsel for the first time on appeal." In re Stephen, 401 Mass. 144, 150 (1987). Aside from suggesting that counsel should have objected to nonspecific "evidence," the father provides no description of what counsel should have done differently or demonstration that it would have affected the

16

outcome of the case.  Accordingly, he has failed to demonstrate that he received ineffective assistance of counsel.

Finally, father 1 questions the jurisdiction of the Juvenile Court in this proceeding.  Under G. L. c. 119, §§ 24, 26 (b) (4); G. L. c. 218, § 59; G. L. c. 209B; and G. L. c. 210, § 3, the Juvenile Courts of Massachusetts have jurisdiction over care and protection cases and termination of parental rights cases within their respective districts.  The Supreme Judicial Court has held that, "[w]here a child 'is not receiving adequate care and protection, the department [(DCF)] may file a petition . . . to summons the child's parent "to show cause why the child should not be committed to the custody of the department or why any other appropriate order should not be made."'"  Care & Protection of Jaylen, 493 Mass. 798, 802-803 (2024), quoting Care & Protection of Zeb, 489 Mass. 783, 785 (2022).  Contrary to father 1's argument, his case was decided by a duly-appointed Juvenile Court judge, not an administrative judge.  Whatever natural rights father 1 has, the Juvenile Court has jurisdiction over the custody of children living in Massachusetts and the determination whether the parents are currently fit to parent their children and whether the best interests of the child require termination of parental rights.  Custody of Victoria, 473 Mass. 64, 68-70 (2015).  Accord G. L. c. 209B, § 2 (a) (1).

17

7.  Posttermination visitation by father 2.  "The decision whether to grant posttermination visitation is within the judge's sound discretion."  Adoption of Cecily, 83 Mass. App. 719, 727-728 (2013).  A two-part inquiry informs a judge's decision to order visitation:  "First, is visitation in the child's best interest?  Second, in cases where a family is ready to adopt the child, is an order of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?"  Adoption of Ilona, 459 Mass. 53, 63 (2011).  To determine whether visitation is in the child's best interest, the judge will consider "whether there is 'a significant, existing bond with the biological parent' whose rights have been terminated."  Id. at 63-64, quoting Adoption of Vito, 431 Mass. 550, 563 (2000).

Here, the judge ordered that father 2 be provided with annual reports about Idra's progress but did not mandate visitation.  We discern no abuse of discretion as the judge properly concluded that there was no evidence of an existing emotional bond between father 2 and Idra, and the record reveals no "other circumstances of the actual personal relationship of the child and the biological parent."  See Adoption of Rico, 453 Mass. 749, 759 (2009), quoting Adoption of Vito, 431 Mass. at 562.  Father 2 started visiting the child only in March 2021,

18

when she was fourteen months old.  In total, father 2 visited Idra twelve to sixteen times before he fled the state.  By the time of trial, father 2 had not visited the child in over a year.

Father 2 argues that DCF offered him an open adoption agreement with posttermination visits].  The judge, however, was not bound by DCF's position or opinions, but rather had to exercise his own discretion in deciding whether to order posttermination visits.  See Adoption of Terrence, 57 Mass. App. Ct. 832, 839 (2003).  The purpose of posttermination visitation is not for the benefit of the child's biological parents, but "to assist the child as [she] negotiates, often at a very young age, the tortuous path from one family to another."  Adoption of Vito, 431 Mass. at 564-65.  Considering the amount of time that the child has spent with her preadoptive family compared to the time spent with father 2, the judge acted within his discretion

in finding that ordering additional visits with father 2 will not aid in this transition.

Decrees affirmed.

By the Court (Ditkoff, D'Angelo & Wood, JJ.[8]),

Clerk

Entered:  December 19, 2025.

---

[8] The panelists are listed in order of seniority.